GREAT LAKES STEEL DIVISION OF NATIONAL STEEL CORPORATION v MICHIGAN PUBLIC SERVICE COMMISSION

Docket No. 61299. Submitted October 5, 1983, at Lansing.—Decided November 21, 1983. Leave to appeal applied for.

In 1979, following extensive hearings conducted pursuant to the Administrative Procedures Act, the Michigan Public Service Commission found that Michigan Consolidated Gas Company had a total revenue deficiency of $56,353,000 and ordered revenues from sales of natural gas increased accordingly so as to provide a reasonable return on investment. The MPSC order authorized Consolidated Gas to increase its rate to produce additional revenues and to adopt a new and innovative rate structure allocating to industrial classes of customers a portion of the winter heating costs which otherwise would be borne by residential customers. Great Lakes Steel Division of National Steel Corporation and Michigan Energy Users Group, a voluntary association of industrial firms comprised of BASF Wyandotte Corporation, Chrysler Corporation, McLouth Steel Corporation, Monsanto Company, and Pennwalt Corporation, filed suit against the MPSC and Consolidated Gas in Ingham Circuit Court appealing the decision of the MPSC. The court entered two orders in the case. One, issued by Acting Circuit Judge Thomas G. Roberts, affirmed the MPSC's order. The second order, issued by Michael Harrison, J., denied plaintiffs' motion to discover the MPSC's decisional thought process in deciding which of two submitted rate design proposals to choose. Plaintiffs appeal from the orders entered by the circuit court claiming that the MPSC's order, approved by the circuit court, is not based upon competent, material, and substantial evidence, is arbitrary and capricious, and results in unlawful and unreasonable rates. Plaintiffs also contend that the circuit court improp-

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 2 Am Jur 2d, Administrative Law § 678 et seq.
[1] 64 Am Jur 2d, Public Utilities § 282.
[3] 31 Am Jur 2d, Expert and Opinion Evidence §§ 181, 182.
[4-8] 64 Am Jur 2d, Public Utilities §§ 240 et seq., 277.
[8] 29 Am Jur 2d, Evidence § 127.
[9] 2 Am Jur 2d, Administrative Law §§ 482, 488, 492.

erly denied discovery into the thought process of the MPSC. Defendants counter by arguing that: (1) as members of the industrial class of customers, plaintiffs are without standing to challenge the rate structure within the residential class; (2) the function of designing rates and allocating revenues among classes of customers is a legislative function, reviewable on appeal for abuse of discretion; (3) that imposition of the competent, material, and substantial evidence standard of review would impose new and unwarranted restrictions on the MPSC's broad discretion to experiment and try new and novel rate structures and policies designed to cope with the recent decline in the long term supply of gas resources. Defendants also argue that the trial court properly denied discovery into the MPSC's thought process. *Held:*

1. Plaintiffs have standing to challenge the rate structure within the residential class. In attacking the allocation portion of the MPSC's order, the plaintiffs were attacking the rate structure as well. Defendants' argument that, because plaintiffs' bill of complaint only challenged the allocation of rates and did not contain any allegations which would lead the Court of Appeals to believe that plaintiffs were challenging the rate structure, plaintiffs were precluded from raising any issue as to structure is rejected.

2. Ratemaking is essentially a legislative rather than a judicial function and the proper standard of review in ratemaking matters is an abuse of discretion, which in the context of a utility rate case subsumes both the constitutional evidentiary test, which holds that decisions and orders of any administrative agency be supported by competent, material, and substantial evidence on the whole record, and the statutory test of reasonableness. The residential winter heating rate design adopted by the MPSC is reviewable under the standard of reasonableness or abuse of discretion. Based on the testimony of one of the witnesses and on the experimental authority and the expertise of the MPSC, a clear and convincing basis on which to conclude that the order complained of was unlawful or unreasonable or was an abuse of discretion cannot be identified. The circuit court did not err in refusing to set aside the order of the MPSC.

3. The circuit court did not err in refusing to permit pretrial discovery of items which allegedly formed the basis of the MPSC's rate order. Plaintiffs sought information so broad as to touch upon the mental process by which a conclusion is reached. To allow discovery of such information would have

been an impermissible intrusion into the MPSC's thought process.

Affirmed.

1. PUBLIC UTILITIES — RATE INCREASES — PUBLIC SERVICE COMMISSION — APPEAL.

The proper standard for review of a Michigan Public Service Commission rate increase for a public utility is whether the commission's decision was an abuse of discretion; in the context of a utility rate case the standard of abuse of discretion subsumes both the constitutional mandate that decisions and orders of any administrative agency be supported by competent, material, and substantial evidence on the whole record and the statutory test of reasonableness (Const 1963, art 6, § 28; MCL 462.26; MSA 22.45).

2. CONSTITUTIONAL LAW — ADMINISTRATIVE LAW — EVIDENCE.

The constitutional mandate that decisions and orders of any administrative agency be supported by competent, material, and substantial evidence on the whole record applies only to decisions and rulings which are judicial or quasi-judicial (Const 1963, art 6, § 28).

3. EVIDENCE — EXPERT WITNESSES — SUBSTANTIAL EVIDENCE.

Expert witness testimony is substantial for purposes of the constitutional mandate that decisions and orders of any administrative agency be supported by competent, material, and substantial evidence on the whole record if offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree.

4. PUBLIC UTILITIES — RATE INCREASES — PUBLIC SERVICE COMMISSION — INTERIM ORDERS — EXPERIMENTAL RATE RELIEF.

The Michigan Public Service Commission need not determine a request for an interim order for partial rate relief under the same strict standards that apply to permanent orders; by analogy the same reasoning extends to an experimental rate relief order.

5. ADMINISTRATIVE LAW — PUBLIC SERVICE COMMISSION.

The determination of the Michigan Public Service Commission, on matters involving the exercise of good common sense and judgment only, must be held to be final unless such determination in its application results in the establishment by clear and convincing proof of a rate so low as to be confiscatory or so high as to be oppressive.

6. PUBLIC UTILITIES — RATES — PUBLIC SERVICE COMMISSION —
   APPEAL.

   What return a public utility shall be entitled to earn upon its
   invested capital and what items shall be considered as properly
   going to make up the sum total of that invested capital are
   questions of fact for the determination of the Michigan Public
   Service Commission, and their conclusions thereon, upon which
   the rate is based, are unassailable unless, as a necessary result,
   it can be affirmatively asserted that the resultant rate is
   unreasonable and unlawful.

7. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATES —
   PRESUMPTIONS.

   All rates, fares, charges, classification and joint rates, regulations,
   practices, and services prescribed by the Michigan Public Ser-
   vice Commission are deemed, prima facie, to be lawful and
   reasonable (MCL 462.25; MSA 22.44).

8. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ORDERS —
   BURDEN OF PROOF.

   Any person attacking an order of the Michigan Public Service
   Commission has the burden of proving by clear and satisfactory
   evidence that the order is unlawful or unreasonable (MCL
   462.26; MSA 22.45).

9. ADMINISTRATIVE LAW — AGENCY DECISIONS — EVIDENCE — DISCOV-
   ERY.

   There are two well-recognized exceptions to the rule that infor-
   mation which is part of the decision-making process of an
   administrative agency is not subject to discovery: (1) where the
   decision makers have demonstrated bad faith or improper
   behavior and (2) where the administrative record is inadequate
   to explain the action taken; to come within the first exception,
   a most powerful preliminary showing of bad faith must be
   made, and whether a situation falls within the second excep-
   tion depends upon case law on how inadequate a record must
   be before it falls within the exception; Michigan case law
   suggests that the exception applies only when there is virtually
   no record or no explanation for the decision reached.

*Hill, Lewis, Adams, Goodrich & Tait* (by *Douglas
H. West* and *Diane M. Soubly*), for Great Lakes
Steel Division of National Steel Corporation.

*Albert J. Thorburn,* for Michigan Energy Users Group.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Arthur E. D'Hondt* and *R. Philip Brown,* Assistants Attorney General, for Michigan Public Service Commission.

*Foster, Swift, Collins & Coey, P.C.* (by *Webb A. Smith and William K. Fahey),* and *David P. Van Note* and *Daniel L. Schiffer),* for Michigan Consolidated Gas Company.

Before: ALLEN, P.J., and BEASLEY and M. E. CLEMENTS,* JJ.

ALLEN, P.J. Plaintiffs appeal as of right two opinions and orders pursuant thereto of the Circuit Court for Ingham County. One opinion, issued October 23, 1981, by Acting Circuit Judge Thomas G. Roberts, affirmed a November 6, 1979, order entered by defendant Michigan Public Service Commission (MPSC) authorizing defendant Michigan Consolidated Gas Company (MCG) to increase its rates to produce additional revenues of $56,357,000 and to adopt a new and innovative rate structure allocating to industrial classes of customers a portion of the winter heating costs which otherwise would be borne by residential customers. The second opinion, issued one year earlier on October 23, 1980, by Circuit Judge Michael Harrison, denied plaintiffs' motion to discover MPSC's decisional thought process.

Plaintiffs are industrial companies purchasing from MCG some 40 billion cubic feet of natural gas

---

* Circuit judge, sitting on the Court of Appeals by assignment.

per year at a cost of approximately $124 million a year under the rates established by the MPSC when this action was filed in Ingham County Circuit Court. In addition to Great Lakes Steel, plaintiff companies include the members of the Michigan Energy Users Group, a voluntary association of industrial firms comprised of BASF Wyandotte Corporation, Chrysler Corporation, McLouth Steel Corporation, Monsanto Company, and Pennwalt Corporation.

In 1979, following extensive hearings conducted pursuant to the Administrative Procedures Act, the MPSC found a total revenue deficiency of $56,353,000 and ordered revenues from sales of natural gas increased accordingly so as to provide a reasonable return on investment.

In this situation, having determined that additional revenues are needed, the MPSC must adopt a new rate structure which will yield the additional revenues. This is called the "rate design" phase and is a two-step process. First, the MPSC *allocates* how much of the new revenue should be borne by each class of customer; *viz.,* commercial, residential, industrial, schools, etc. Second, rates for each class are structured to produce the newly allocated revenues.

In the instant case, as part of this two-step process, the MPSC staff submitted two proposals. Through witness Wilbur McNinch, a rate design proposal was submitted containing the same differentials between classes as last approved by the MPSC in case U-5365[1] and would have resulted, if adopted, in an increase of approximately equal percentage in the revenue of the several rate classes. A second rate design proposal was submit-

---

[1] Case U-5365 was the previous MCG rate case. The staff proposal called for continuing the structure of commodity charges as last approved in that case.

ted by staff witness Hasso Bhatia. This proposal was designed to provide relief to low income residential gas customers who had difficulty paying their winter heat bills and was also intended to encourage gas conservation by all residential gas users. Unlike the primary proposal which allocated the increase approximately equally between classes, the alternate proposal caused the industrial customers as a class to pay some $6,000,000 more than they would pay under the McNinch proposal. However, expressed in percentage terms, the increase over the McNinch proposal was not significant, representing only 1.5% of the total average rate for industrial customers.

The alternate proposal was strongly opposed by plaintiffs and, on August 10, 1979, was rejected by the hearing officer on grounds that it lacked evidentiary support and would not benefit low income customers. The hearing officer recommended adoption of the primary rate design proposal. Nevertheless, on November 6, 1979, a majority of the MPSC overruled the recommendation of the hearing officer and adopted the residential winter heating rate structure proposed by Bhatia. Later, one member of the MPSC filed a dissent on grounds that a factual basis was lacking for achieving the purpose of benefiting low income residential customers and improving conservation of energy.

On December 5, 1979, plaintiffs filed an appeal in the Circuit Court for Ingham County as provided in § 26(a) of 1909 PA 300. MCL 462.26(a); MSA 22.45(a). Plaintiffs' complaint alleged that the residential winter heating rate established by the MPSC order dated November 6, 1979: (1) exceeded the statutory authority of the MPSC; (2) was violative of due process of law; (3) was not supported by competent, material, and substantial

evidence on the record; and (4) was arbitrary, capricious, and clearly an abuse of discretion. On May 22, 1980, the circuit court granted plaintiffs leave to file a second amended complaint alleging that one or more MPSC members had been prejudiced as to the adoption of the residential winter heating rate. In connection with the preparation of the second amended complaint, plaintiffs sought by interrogatories to discover what facts had been considered and what actions had been taken by one member of the MPSC majority in arriving at his decision regarding rate design. Objection was filed by the MPSC on grounds, *inter alia,* that the thought process rule barred such discovery. In an opinion dated October 23, 1980, Judge Harrision found that none of the exceptions to the thought process rule applied and declined to permit the requested discovery. In a subsequent opinion, dated October 23, 1981, Judge Roberts found that the MPSC decision was supported by competent, material, and substantial evidence on the record. On November 13, 1981, Judge Roberts entered an order affirming the MPSC order.

Both orders were appealed as of right to this Court and come to us on the original record made before the MPSC and on the transcript of the hearings in circuit court. On appeal plaintiffs do not challenge the total revenue requirements found to be necessary as a result of the deficiency of $56,353,000 in gas sales revenues. Plaintiffs concede that this amount of rate relief is appropriate but question both the allocation of the increase among the various classes of MCG's customers and the rate structure within the residential class.[2] Specifically, plaintiffs claim that the MPSC's order

---

[2] Plaintiffs primarily oppose the *allocation* of the increase among the classes of customers, but also contest the particular rate *structure* within the residential class; *viz.,* "block" design.

of December 6, 1979, as approved by the circuit court: (1) is not based upon competent, material, and substantial evidence as mandated in this Court's opinion in *Consumers Power Co v Public Service Comm*, 78 Mich App 581; 261 NW2d 10 (1977), (2) is arbitrary and capricious, and (3) results in unlawful and unreasonable rates. Plaintiffs further claim that in connection with the drafting of the second bill of complaint, the circuit court improperly denied discovery into the "thought processes" of the MPSC. Defendants MPSC and MCG argue that: (1) as members of the industrial class of customers, plaintiffs are without standing to challenge the rate structure within the residential class; (2) the function of designing rates and allocating revenues among classes of customers is a legislative function, reviewable on appeal for abuse of discretion; and (3) that imposition of the competent, material, and substantial evidence standard of review would impose new and unwarranted restrictions on the MPSC's broad discretion to experiment and try new and novel rate structures and policies designed to cope with the recent decline in the long term supply of gas resources. Defendants also argue that the trial court properly denied discovery into the MPSC's thought process.

I

*Did the circuit court err in refusing to set aside the MPSC rate order?*

Because plaintiffs support the "primary rate design" proposal initially proposed by witness McNinch, and oppose the alternate rate design proposal of witness Bhatia, it is helpful to indicate how the two proposals differ. As indicated earlier, they differ both in *allocation* and *structure*. Under

the McNinch proposal, the revenue responsibility of each class is allocated by approximately equal increases. The alternate proposal results in some $6,000,000 more being allocated to industrial rate class 6 and the interruptible rate class 7. As to structure, the McNinch proposal provided for a flat or uniform charge for each unit of gas purchased by a particular customer. Under the alternate proposal, different rates were charged for different "blocks" of gas usage.[3] Plaintiffs contend that, both as to allocation and structure, the MPSC's order is not supported by competent, material, and substantial evidence on the whole record nor by detailed findings of fact as required by *Consumers Power Co, supra.*

The Attorney General and MCG raise the threshold issue that, because plaintiffs' bill of complaint only challenged the allocation of rates and did not contain any allegations which would lead this Court to believe that plaintiffs were challenging the rate structure, plaintiffs are precluded from raising any issue as to structure. In support of this argument, defendants point out that plaintiffs are industrial class customers, that, as such, they are not aggrieved by the MPSC's decision to adopt the "block" design within the residential class, and that, consequently, they lack standing to question the revenue structure portion of the MPSC's order.

We find the threshold argument too technical. While the complaint challenged only the allocation of $6,000,000 more to the industrial class, it is not denied that it is the establishment of "rate blocks"

---

[3] Residential customers were charged a $4 a month service charge, $2.23 per 1,000 cubic feet (mcf) for the first 10 mcf of gas used, $2.03 per mcf for the next 20 mcf of gas used, and $2.53 per mcf for all additional gas consumed during the six winter months, November through April.

which was the *raison d'etre* for requiring indus-trial customers to pay $6,000,000 more. Thus, it is clear to us that in attacking the allocation portion of the MPSC's order the plaintiffs were attacking the structure as well.

Next, the Attorney General and MCG disclaim the substantial evidence standard advanced by plaintiffs and, instead, argue that the proper stan-dard of review in matters involving ratemaking, which is essentially a legislative rather than a judicial function, *Detroit Edison Co v Public Ser-vice Comm,* 82 Mich App 59, 67; 266 NW2d 665 (1978), is the standard of rationality and reason-ableness. Under that standard, decisions involving the structuring of rates, particularly where the rate is imposed as an experimental rate and on a trial basis, will be set aside only if the decision is arbitrary, capricious, or is an abuse of discretion. For the several reasons set forth below, we hold that the proper standard for review in the case before us is whether the MPSC's decision is an abuse of discretion, which in the context of a utility rate case subsumes both standards—the constitutional evidentiary test of Const 1963, art 6, § 28, and the statutory test of reasonableness, MCL 462.26; MSA 22.45.

First, we are not here concerned with rate in-creases in the usual manner in which increases are granted. Here, the rate increase of some $56 million is not contested. Only the manner in which that increase is allocated among the several classes of customers is challenged. The mandate found in Const 1963, art 6, § 28, that decisions and orders of any administrative agency be "supported by competent, material, and substantial evidence on the whole record" applies only to decisions and rulings *"which are judicial or quasi-judicial".* As

was stated in the dissenting opinion of Justice WILLIAMS in *Consumers Power Co v Public Service Comm,* 415 Mich 134; 327 NW2d 875 (1982):

> "The courts have neither the authority nor the expertise to determine what rate structure most equitably spreads a rate increase among commercial, industrial, household and other users." 415 Mich 172.

In any event, it was for the PSC to weigh the conflicting opinion testimony of the qualified ("competent") experts to determine how the evidence preponderated on this point. See *Aquilina v General Motors Corp,* 403 Mich 206, 211-212; 267 NW2d 923 (1978). Expert opinion testimony is "substantial" if offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree. To hold otherwise would thus neutralize all expert testimony in cases of conflict and the party with the burden of proof would automatically lose. Const 1963, art 6, § 28, intends no such absurd result.

Second, the challenged residential winter rate was not adopted as a permanent order but instead was adopted on an experimental basis.[4] In *Great Lakes Steel Div of Nat'l Steel Corp v Public Service Comm,* 94 Mich App 694, 701; 290 NW2d 54 (1980), this Court recognized that a request for an interim order for partial relief is not to be reviewed under the same strict standards as apply to permanent orders:

> "The commission need not, in making a determination on a request for partial and immediate relief, have

[4] Recognizing that Dr. Bhatia was unable to quantify the amount of conservation that would occur or precisely correlate income levels with gas consumption the MPSC found "the only realistic method by which to study and analyze this rate design is to implement it and monitor the results". MPSC Opinion, p 57.

before it the type of plenary, expert analysis which the staff prepares on an application for a permanent rate increase. That construction of § 85 would thoroughly undermine the commission's authority under MCL 460.6a; MSA 22.13(6a) to act without delay in order to prevent irreparable harm to the utility. See *Attorney General v Public Service Comm,* 63 Mich App 69, 77; 234 NW2d 407 (1975). In deciding how to allocate the surcharge among classes of customers, the commission may notice and consider facts drawn from its expertise and from general knowledge, as well as evidence presented by the parties."

We recognize that the above quotation refers to a partial rate order rather than to an experimental order as in the case before us. Nevertheless, by analogy the same reasoning persuasively extends to an experimental order.

Third, while never directly addressed in Michigan, the question of the adoption of experimental rates has been recognized in other jurisdictions. As stated in 2 Davis, Administrative Law Treatise, § 18.08, p 599:

"[A] well-devised regulatory system 'permits rates to be experimentally laid down and experimentally tried out. It preserves that flexibility of adaptation, the maintenance of which is necessary to the life and growth of our great and changing commerce'." Citing *Arizona Grocery Co v Atchison, T & S F R Co,* 284 US 370; 52 S Ct 183; 76 L Ed 348 (1932).

Similarly, the concept of experimental rates on a test basis was sustained in *Market Street R Co v Railroad Comm of the State of California,* 324 US 548, 569; 65 S Ct 770, 780-781; 89 L Ed 1171, 1186 (1945):

"The fixing of future rates always involves an element of prediction. Even monopolies must sell their

services in a market where there is competition for the consumer's dollar and the price of a commodity affects its demand and use. This effect may be predicted or projected, but it can be known only from experience. The many detailed objections which the Company makes to the Commission's computations of probable yield would be answered by experience * * *. Under such circumstances we think it is not forbidden by the Constitution that there be a pragmatic test of matters which even the most expert could not know in advance."

Where rates are adopted on an experimental basis, they cannot be reviewed under the substantial evidence standard of review. By their very nature, unless arbitrary or capricious, they must await results on a test basis. In the instant case, the MPSC acted to implement the residential winter heating rate on a test basis in order to determine to what degree the new rate would conserve gas usage and what relief would be afforded home owners.

Fourth, were this simply a testimonial conflict to be resolved on the basis of the credibility of competing witnesses, the primacy accorded to the findings of the hearing examiner, who was the only person to see and hear the live witnesses, might require us to set aside the MPSC's contrary conclusions absent persuasive reasons for according the testimony different weight or assessing its credibility differently. *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc*, 393 Mich 116, 126-127; 223 NW2d 283 (1974). But here, as we have stated earlier, we are not dealing with the fixing of rates. We are dealing with the allocation of the burden of producing new revenues, which we regard as more a matter of policy than of fact finding, more a legislative than a judicial function.

Fifth, the MPSC's action in the instant case comports with federal policy. Federal policy, even when not controlling, is at least persuasive where permissive. *Federal Energy Regulatory Comm v Mississippi,* 456 US 742, 760; 102 S Ct 2126, 2137-2138; 72 L Ed 2d 532, 547 (1982). 1978 US Code Cong & Ad News lists the following factors as relevant in structuring utility retail rates:

"In considering the standards set forth in this section, it is expected that State regulatory authorities * * * take into account the need to protect ratepayers against sudden shifts in electric utility rates which might lead to significant economic hardships. The State regulatory authorities * * * may consider phasing in the implementation of the standards, providing for temporary exemptions from implemented standards, or providing other means determined appropriate by the State authorities * * * to mitigate any such hardships.

"States are also, of course, free to implement, pursuant to State authority, cost of service based rates, time of day rates, seasonal rates, and other concepts related to any standard established by this subtitle * * *.

* * *

"Subsection (d) establishes the Federal standards to be considered under this procedure: cost of service, declining block rates, time of day rates, seasonal rates, interruptible rates, and load management techniques." 1978 US Code Cong & Ad News, p 7807.

These federal policies are reflected in the legislation to which the above report refers. 16 USC 2624 provides for special reduced residential electric rates pursuant to the "lifeline" concept, which the conference committee summarized thus:

"The purpose of this section is to authorize lifeline rates as an exception to the Federal standard on cost of service (section 111[d][1]). Thus, if a State regulatory authority * * * adopts the Federal standard on cost of

service, this legislation would not prohibit the adoption of lifeline rates as well, even though a certain portion of the charge to residential electric consumers would not necessarily reflect the cost of providing service to them." 1978 US Code Cong & Ad News, p 7811.

A similar federal policy of protecting necessitous citizens from the catastrophic effects of leapfrogging natural gas heating costs is found in 15 USC 3204(a), which provides in relevant part:

> "The procedures for termination of service * * * are procedures prescribed by the State regulatory authority (with respect to gas utilities for which it has ratemaking authority) * * * which provide that—
>
> "(2) during any period when termination of service to a gas consumer would be especially dangerous to health * * * and such consumer establishes that
>
> "(A) he is unable to pay for such service in accordance with the requirements of the utility's billing, or
>
> "(B) he is able to pay for such service but only in installments,
> "such service may not be terminated."

The MPSC's experimental rate order in the instant case appears to us to be consistent with these federal doctrines and to be a rational approach to resolving the need to both provide the utility a reasonable rate of return but at the same time to mitigate the hardship falling on residential customers. After all, the acquisition and transportation of natural gas is imbued with a public trust and may be regulated in furtherance of state and national policies. Thus, this is not a question of 'competent, material and substantial evidence on the record taken as a whole" but is one of rationality and reasonableness and is reviewable according to such circumscribed parameters. As stated in *Michigan Bell Telephone Co v Public Service*

*Comm,* 332 Mich 7, 26; 50 NW2d 826 (1952), quoting with approval from *Detroit v Michigan Railroad Comm,* 209 Mich 395; 177 NW 306 (1920):

"On matters involving the exercise of good common sense and judgment only, the determination of the commission must be held to be final unless such determination in its application results in the establishment by 'clear and convincing' proof of a rate so low as to be confiscatory or so high as to be oppressive. What return a public utility shall be entitled to earn upon its invested capital, and what items shall be considered as properly going to make up the sum total of that invested capital, are questions of fact for the determination of the commission, and their conclusions thereon, upon which the rate is based, are unassailable unless, as a necessary result, *it can be affirmatively asserted that the resultant rate is unreasonable and unlawful.*" (Emphasis supplied.)

Accord, *Attorney General v Public Service Comm,* 118 Mich App 311, 316; 324 NW2d 628 (1982).

Finally, we observe that in the most recent case involving review of orders of the MPSC, *Attorney General v Public Service Comm,* 122 Mich App 777; 333 NW2d 131 (1983), this Court stated that such review was narrow in scope and that orders of the MPSC would be upheld unless proven by clear and convincing evidence to be "unlawful or unreasonable":

"The scope of appellate review of orders of the Public Service Commission is quite narrow. To begin with, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the commission are deemed, prima facie, to be lawful and reasonable. MCL 462.25; MSA 22.44; *Michigan Consolidated Gas Co v Public Service Comm,* 389 Mich 624; 209 NW2d 210 (1973); *Consumers Power Co v Public Service Comm,* 65 Mich App 73; 237 NW2d 189 (1975). The

person attacking an order of the commission has the burden of proving by clear and satisfactory evidence that the order complained of is *unlawful or unreasonable.* MCL 462.26; MSA 22.45; *Lansing v Public Service Comm,* 330 Mich 608; 48 NW2d 133 (1951); *Michigan Bell Telephone Co v Public Service Comm,* 85 Mich App 163; 270 NW2d 546 (1978)." 122 Mich App 796-797. (Emphasis supplied.)

To summarize: we hold that the residential winter heating rate design adopted by order of the MPSC in the instant case is reviewable under the standard of reasonableness or abuse of discretion. To hold otherwise would too narrowly circumscribe the powers of the MPSC to adopt innovative and experimental rates. When so reviewed, we find Dr. Bhatia's testimony more than sufficient to sustain the contested orders. While his direct, prefiled, written testimony contained only nine pages, his cross-examination covered 162 pages. When asked whether the proposed rate design might in effect raise residential rates, he responded that it "lowers the bills for almost 95% of the customers compared to the proposal of Mr. McNinch, for example". When pressed on the details of the "block" sliding scale design, he explained that "about 80% of customers will use up 30 mcf in winter months will save about $4 or about 6% per month". Clearly, this testimony supplied a sufficient factual basis for the MPSC's conclusion that the rate design would benefit low income persons. Dr. Bhatia was extensively examined concerning availability and costs of alternate fuel. This testimony supplied the factual basis for the MPSC's finding that industrial customers are able to use alternate energy sources and that the higher cost of alternative fuel should be considered in designing rates for such customers. Otherwise,

industrial customers could in effect buy up all the cheap fuel and force residential customers to resort to less accessible and more expensive alternatives. A homeowner with a gas forced-air furnace cannot convert to oil or coal except by replacing the entire furnace; a gas-fired industrial boiler can more readily be adapted to use other fuels. Admittedly, Dr. Bhatia's testimony as to whether the proposed rate design would encourage conservation was weak. The MPSC, however, made no finding that conservation would occur, but did order monitoring for the purpose of determining whether or not conservation would occur.

Evidence supporting the MPSC's finding that industry is in better position to bear a greater portion of increased costs is found in the testimony that of more than $12 million in uncollectible billings, none was attributable to industrial customers. Furthermore, it is common knowledge that many industries are equipped to use more than one type of fuel, that block rates which increase as more fuel is used encourage conservation of fuel, and that industrial customers, in contrast to residential customers, may pass on price increases to ultimate consumers. Considerations outside the record may nevertheless be used by the MPSC based on its own expertise and experience. *Great Lakes Steel v PSC, supra,* 94 Mich App 701.

Based on the testimony of witness Bhatia and on the experimental authority and the expertise of the MPSC, we cannot identify a "clear and convincing" basis on which to conclude that the order complained of was unlawful or unreasonable or was an abuse of discretion. Accordingly, we conclude that the circuit court did not err in refusing to set aside the order of the MPSC.

## II

*Did the circuit court err in refusing to permit pretrial discovery of items which allegedly formed the basis of the majority's rate order?*

Acting on the apparent belief that one member of the MPSC had prejudged the residential winter heating rate issue, plaintiffs submitted interrogatories 5 through 9, requesting the following information:

"5. Identify with particularity, or in lieu thereof attach copies thereof to defendant's answers to these interrogatories, any document, note, memorandum, letter or similar writing, however characterized, which was in any way relied upon or referred to by either member of the majority of the defendant commission in connection with its findings, conclusions and/or statements referred to in interrogatories 4a through 4f above, other than the record of the proceedings before the commission.

"6. State the names of all persons, including members of the defendant commission, who in any way participated in the decision that an 'alternate rate design' would be presented by a member of the commission's staff, in addition to the rate design sponsored by staff witness Wilbur McNinch.

"7. State the names of all persons, including members of the defendant commission, who in any way participated in the decision to designate Dr. Hasso Bhatia as the staff member responsible for presenting such 'alternate rate design'.

"8. List the names of all individuals who participated in writing preliminary or final versions of the commission's majority opinion and order in Case U-5955, which was finally adopted by the commission majority on November 6, 1979.

"9a. Describe in detail each and every note, memorandum, report, letter or other similar writing by whatever name, within defendant's custody or control, other than that which is a part of the record of the proceed-

ings in Case U-5955, which in whole or in part refers to the staff's 'alternate rate design' including any preliminary or final drafts of the commission majority's opinion and order as finally adopted by it on November 6, 1979.

"9b. If defendant is willing to do so without a formal request for production of documents under Michigan General Court Rule 310, please provide copies of all of the above documents with answers to these interrogatories."

In an opinion dated October 23, 1980, Circuit Judge Michael Harrison held that, while the interrogatories were directed to facts which may tend to establish prejudgment, the interrogatories seek information which is part of the decision-making process and which under *United States v Morgan,* 313 US 409; 61 S Ct 999; 85 L Ed 1429 (1941), is an impermissible intrusion into the MPSC's thought process. On appeal, plaintiffs contend that *Morgan* does not foreclose the requested discovery in this case because the interrogatories only request information "as to objective facts" and do not inquire what motivated the majority to adopt the rate in question or why the majority believed industrial customers should pay more. We disagree.

We find the interrogatories so inclusive that, for practical purposes, they delve into the MPSC's mental process. For example, interrogatory 5 seeks "any document, note, memorandum, letter or similar writing, however characterized, which was *in any way relied upon or referred to by either member of the majority"*. Surely, this inquiry is so broad as to touch upon the mental process by which a conclusion is reached. Interrogatory 6 asks for the "names of all persons * * * who in any way participated in the decision that an 'alternate rate design' would be presented by a member of the commission staff". Interrogatory 8 requests

the "names of all persons who participated in writing preliminary or final versions of the commission's majority opinion". Agency opinions and decisions routinely go through a preliminary draft followed by redrafts and amendments. Normally, staff members participate in the writings. To inquire into who participated in each writing certainly invades the agency's thought process.

Nor do we agree with plaintiffs' claim that the instant case falls within either of two well-recognized exceptions to the *Morgan* thought process rule: (1) where the decision makers have demonstrated bad faith or improper behavior, *National Nutritional Foods Ass'n v Food & Drug Administration, United States Dep't of Health, Education & Welfare,* 491 F2d 1141 (CA 2, 1974), or (2) where the administrative record is inadequate to explain the action taken, *Citizens To Preserve Overton Park, Inc v Volpe,* 401 US 402; 91 S Ct 814; 28 L Ed 2d 136 (1971). In order to come within the first exception, a "most powerful preliminary showing" of bad faith must be made. *National Nutritional Foods, supra,* p 1146. While plaintiffs' brief contains many references to alleged prejudgment on the part of one commissioner, the only allegation of misconduct at the time the interrogatories were submitted is a single statement in ¶ 27 of plaintiffs' second amended complaint that MPSC members had prejudged the adoption of the residential winter heating rate. We do not find that single, conclusory statement a sufficiently "powerful" showing as required under *National Nutritional Foods.*

Whether the instant situation falls within the second exception depends upon case law on how "inadequate" a record must be before it falls within the exception. Case law suggests that the

exception applies only where there is virtually no record or no explanation for the decision reached. In *National Nutritional Foods* there were no findings. In *Smith v Federal Trade Comm,* 403 F Supp 1000 (D Del, 1975), there were no contemporaneous findings and the court suspected the full record had not been provided. In *DC Federation of Civic Ass'ns v Volpe,* 316 F Supp 754 (D DC, 1970), the court had no record and no written decision by the agency.

In the instant case, unlike the situations in the above cited cases, there is a record and the MPSC made findings of fact explaining why it arrived at the decision made. Although plaintiffs claim the explanation is inadequate on the technical grounds mentioned in Part I of this opinion, the explanation is fully adequate for the issue raised here. *Viculin v Civil Service Dep't,* 386 Mich 375, 406; 192 NW2d 449 (1971). Accordingly, the circuit court's denial of the written interrogatories is affirmed.

Affirmed. No costs, questions of public importance being involved.