ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket No. 101981. Submitted June 8, 1988, at Lansing. Decided August 12, 1988.

Following proceedings before a hearing officer of the Public Service Commission and the PSC itself on Consumers Power Company's power supply cost recovery reconciliation for the twelve-month period ending December 31, 1984, the PSC issued an order allowing Consumers Power to recover $25,924,462 plus interest from Consumers Power's electric customers by means of a surcharge on its monthly billings for July, 1987, to June, 1988. The amount represented costs incurred by Consumers Power in obtaining replacement electricity made necessary by outages at several of its generating facilities. The Attorney General filed an appeal from the PSC order in the Court of Appeals.

The Court of Appeals *held:*

The relevant statute in this case, MCL 460.6j(13)(c); MSA 22.13(6j)(13)(c), provides that the PSC, in its order in a power supply cost reconciliation, shall disallow net increased costs attributable to a generating plant outage of more than ninety days in duration unless the utility demonstrates by clear and satisfactory evidence that the outage, or any part of the outage, was not caused or prolonged by the utility's negligence or by unreasonable or imprudent management. The record in this case does not support the Attorney General's claim that the PSC erred in determining that Consumers Power was not negligent and that its management was not unreasonable or imprudent with regard to those parts of the outages which the Attorney General challenged.

Affirmed.

PUBLIC UTILITIES — POWER SUPPLY COST RECONCILIATION — PUBLIC SERVICE COMMISSION.

The Public Service Commission, in its order in a power supply

REFERENCES

Am Jur 2d, Public Utilities §§ 240-243, 246 *et seq.*

Amount paid by public utility to affiliate for goods or services as includible in utility's rate base and operating expenses in rate proceeding. 16 ALR4th 454.

cost reconciliation, shall disallow net increased costs attributable to a generating plant outage of more than ninety days in duration unless the utility demonstrates by clear and satisfactory evidence that the outage, or any part of the outage, was not caused or prolonged by the utility's negligence or by unreasonable or imprudent management (MCL 460.6j[13][c]; MSA 22.13[6j][13][c]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Hugh B. Anderson* and *Margaret A. Nelson,* Assistant Attorneys General, for the Attorney General.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Don L. Keskey* and *Philip J. Rosewarne,* Assistant Attorneys General, for the Public Service Commission.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Micheal G. Oliva* and *Ronald W. Bloomberg*), and *David A. Mikelonis* and *Frank R. Knox,* for Consumers Power Company.

Before: Danhof, C.J., and Sawyer and D. R. Freeman,* JJ.

Per Curiam. The Attorney General appeals from a June 16, 1987, opinion and order of the Michigan Public Service Commission which allowed Consumers Power Company to recover $25,924,462, including interest, to compensate the utility for underrecovery of its power supply costs during 1984. The appeal as of right is authorized by 1987 PA 12, MCL 462.26; MSA 22.45.

On March 15, 1985, Consumers Power Company initiated a power supply cost recovery reconciliation proceeding for the twelve-month period ending December 31, 1984, pursuant to § 6j(12) of the public service commission act, MCL 460.6j; MSA

---

* Circuit judge, sitting on the Court of Appeals by assignment.

22.13(6j). The utility alleged that it had under-recovered over $15,000,000 worth of power supply costs during 1984. The underrecovery resulted primarily from a planned refueling outage and four forced outages at Consumers' Palisades nuclear power plant and outages at its Campbell Unit No. 1, Cobb No. 5 and Karn No. 4 fossil-fuel plants. Consumers was required to purchase replacement power to compensate for the power which these plants would have otherwise generated.

Following a hearing, a hearing officer concluded that the utility's underrecovery for 1984 was $20,082,049. Numerous parties filed exceptions to the proposed decision. On June 16, 1987, the PSC filed a forty-one-page opinion and order, allowing the utility to recover $25,924,462 (including interest in the amount of $7,963,756) by means of a uniform surcharge of 0.97 mills per kilowatt hour during the billing months of July 1987 through June 1988.

I

The Attorney General first argues that the hearing officer violated the standard of § 6j(13)(c) and shifted the burden of proof from the utility when he said "RRC [Residential Rate Consortium] did not demonstrate that Westinghouse failed to devote adequate resources of personnel to either the preparation phase or the tube removal." The PSC compounded the error, the Attorney General says, by adopting the hearing officer's analysis and by allowing Consumers Power to recover its net replacement costs for this outage contrary to § 6j(13).

The issue is without merit.

The statute in controversy provides in pertinent part:

In its order in a power supply cost reconciliation, the commission shall:

*   *   *

(c) Disallow net increased costs attributable to a generating plant outage of more than 90 days in duration unless the utility demonstrates by clear and satisfactory evidence that the outage, or any part of the outage, was not caused or prolonged by the utility's negligence or by unreasonable or imprudent management. [MCL 460.6j(13)(c); MSA 22.13(6j)(13)(c).]

Initially, the issue is not properly before the Court because the Attorney General did not raise it before the PSC by timely exception to the hearing officer's proposal for decision. Failure to file exceptions to a proposal for decision in a timely manner constitutes a waiver of the objection. "By not timely raising any objections, the appellant did not give the commission an opportunity to correct any alleged errors. Therefore, these issues have not been preserved for appeal." *Attorney General v Public Service Comm #1,* 136 Mich App 52, 56; 355 NW2d 640 (1984) (quoting approvingly from circuit court opinion).

Second, the Attorney General's argument is premised on alleged error by the hearing officer, but we do not review these decisions. Rather, the binding, reviewable decision is made by the PSC. The Attorney General has not raised a specific objection to the PSC's opinion except to state, without support, that the PSC adopted the hearing officer's analysis "thus compounding the error, and allowing CPCO [Consumers Power Company] to recover its net replacement costs for this period of the outage, contrary to § 6j(13)."

Finally, on the merits, it does not appear that the PSC adopted the hearing officer's analysis. Rather, the PSC's analysis is an independent one.

II

A sparger is a safety device in the Palisades nuclear power plant required by the Nuclear Regulatory Commission (NRC). It disperses feedwater inside the steam generators to prevent water hammer damage to the feedwater nozzles. Inspection revealed that the sparger in the auxiliary feedwater system was broken. Replacement of the sparger took twenty-two days. Electric cables in the plant rest on metal trays. The NRC required Consumers to add fire barriers to many of the trays. Inspection revealed that insulation on some of the cables had deteriorated. Replacing cables and installing fire barriers took eight days.

The question below was whether the utility had an inspection program that could have led to the discovery of the problems with the feedwater sparger and cable tray system earlier and thus saved unnecessary and unreasonable extension of the outage.

The Attorney General argues that the hearing officer erred by considering only whether Consumers' failure to inspect the sparger was negligent and ignoring the equally critical test of subsection 6j, whether the utility exercised unreasonable or imprudent management. The Attorney General says that the PSC did not cure this defect in its order because it adopted the findings and recommendations of the hearing officer. In addition, the Attorney General argues that the hearing officer placed on RRC the obligation of showing whether or not it was industry practice to perform a heat-up analysis of cable trays. By adopting the hearing officer's discussion, the Attorney General argues that the PSC improperly limited the utility's burden under subsection 6j(13)(c) to require only a showing that there was no negligence.

The issue was not preserved for appeal because

the Attorney General did not file an exception to the hearing officer's proposed finding on these aspects of plant management. Besides, the claims are not meritorious. Although the hearing officer may have considered the feedwater sparger question only from the aspect of negligence, the PSC did not. The PSC viewed the problem from a broader perspective, whether any industry-accepted practice would have led to the discovery of the broken safety device by regular inspections. The PSC concluded:

> The basis for RRC's recommendation that the Commission disallow the net replacement cost for 22 days of preparation time is the fact that the preparations would have been performed earlier had Consumers discovered the damage to the sparger earlier in the outage. However, RRC's witness admitted that there is no specific regulatory requirement making it a standard practice for Consumers to inspect the spargers earlier during the outage. Mr. Bridenbaugh did testify that the spargers were safety-related items, the inspection of which would fall under the jurisdiction of ASME Code Section 11, which calls for periodic in-service inspections. However, Mr. Bridenbaugh admitted that ASME Code Section 11 does not specify when the required inspections have to be made. Therefore, even if the spargers were covered by ASME Code Section 11, there is no requirement that the inspection of the spargers should have taken place earlier in the outage.
>
> Further, the Commission believes the rebuttal testimony of Mr. Joos establishes that inspection of the spargers was not required by ASME Code Section 11 because they are not pressure-retaining components but, instead, are internal components of the steam generators. Given these circumstances, the Commission concludes that the [hearing officer] properly rejected RRC's proposed disallowance on this issue.

Similarly, with regard to the cable trays, the Attorney General did not preserve the issue for appeal because he did not file exceptions on the point. In addition, there is no merit to his contention because the PSC found that the utility acted reasonably and prudently in maintaining the fire barriers.

> The Commission finds that the [hearing officer] properly rejected RRC's contention that the cable degradation was due to Consumers' negligence. Consumers was required by the NRC to install 150 fire barriers. Consumers utilized fire barriers that were modified from an NRC-approved design and accepted by the NRC for use at Palisades. Monitoring or testing each of the 150 fire barriers would have been expensive and these precautions were not required by the NRC and have not been followed as general practice in the industry. It is clear that Consumers did not ignore the potential for overheating due to installation of the fire barriers. Consumers considered overheating in designing the fire barriers, and installation of the fire barriers was inspected by both the subcontractor and contractor. Further, a year after the installation a certified fire protection engineer conducted another inspection. *Given these facts, the Commission concludes that Consumers acted reasonably and prudently* in the design installation and inspection of the fire barriers. Therefore, RRC's proposal to disallow the costs associated with the repair of the damaged cables is rejected. [Emphasis added.]

### III

Next, the Attorney General objects to the PSC's allowance of power supply costs to replace generating capacity during outages at the Cobb No. 5 and Karn No. 4 plants. He claims that there is no

evidence that the outages were planned or that they were the result of careful, reasonable and prudent management. We reject the arguments.

The Attorney General did file exceptions to the hearing officer's recommendations on Cobb and Karn. The PSC found, nonetheless, that Raymond Thorson's testimony was credible and uncontested and supported that the outages there were planned. In addition, the PSC concluded that it "believes his testimony satisfactorily establishes that the outages were prudently managed and were neither caused nor prolonged by Consumers' negligence or unreasonable or imprudent management. For these reasons, the Commission finds that the Attorney General's ninth exception must be rejected."

The contention also must be rejected because it is incorrect. Raymond Thorson testified in prepared testimony that both Karn and Cobb were planned outages. He testified that Karn No. 4 was placed out of service to complete warranty work on a turbine. He testified that the outage was started on September 24, 1984, that the HP and IP rotors were shipped to Germany on November 26, 1984, and that the rotors were expected to be back at the plant in April of 1985. He testified that "the disassembly and testing work accomplished to date on this outage is of high quality and the outage is being capably managed."

Thorson also testified that the Cobb No. 5 outage was planned. He testified that Cobb No. 5 was scheduled for regular inspection and was "due for an extensive overhaul including the following work [eleven items]." He testified, "the work was conducted and managed in a prudent manner."

During his in-person direct testimony at the hearing, witness Thorson repeated the comments. He said that Karn No. 4 was shut down for war-

ranty work on the turbine and that Cobb No. 5 was shut down for routine maintenance on eleven items. He testified that the work was conducted and managed in a prudent manner. Thorson attributed the delay at Cobb to unexpected problems they found when they reassembled the boiler. He said:

> The deviation in 1984 on that boiler was identified when they were involved with taking some of the water wall tubing out and getting ready to put it back in and to replace it, that we were having problems with the casing work around the burner areas, and they had not planned on this phase of additional work. And so this caused them to all [sic] behind and it was unidentified the first part of November and the work was determined to be necessary, and so that in order to accomplish this, it delayed that portion of the work and caused the outage to be around 10 days behind at the end of the year.

He testified that Karn was shut down to replace a high pressure generator rotor which necessitated that the blade be sent to Germany for repairs. Based on that testimony, there is evidence in the record to support the PSC's conclusion that the utility handled the problem in a reasonable and prudent manner.

IV

Finally, the Attorney General claims that power costs for the Campbell No. 1 outage should not have been authorized because Consumers presented only cursory and summary evidence which Attorney General witness Steven Miliaras contradicted.

The Attorney General's argument is without merit. He suggests that the replacement costs of

power for the Campbell outage should be denied because neither the hearing officer nor the PSC could determine the cause of the crack in the rotor. The claim is not specific. Further, it completely ignores the PSC's extensive analysis of the issue. The Attorney General claims that the PSC should have adopted the testimony of his witness, Steven Miliaras, rather than utility witnesses. However, the PSC can properly rely on the testimony of a qualified expert and that testimony constitutes competent evidence under the statute. As we said in *Great Lakes Steel Div of Nat'l Steel Corp v Public Service Comm,* 130 Mich App 470, 481; 334 NW2d 321 (1983):

> In any event, it was for the PSC to weigh the conflicting opinion testimony of the qualified ("competent") experts to determine how the evidence preponderated on this point. See *Aquilina v General Motors Corp,* 403 Mich 206, 211-212; 267 NW2d 923 (1978). Expert opinion testimony is "substantial" if offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree. To hold otherwise would thus neutralize all expert testimony in cases of conflict and the party with the burden of proof would automatically lose. Const 1963, art 6, § 28, intends no such absurd result.

The decision and order of the Public Service Commission are affirmed.