174 Mich. App. 63 (1989)
435 N.W.2d 766
ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY
v.
PUBLIC SERVICE COMMISSION
Docket Nos. 100057, 100094.
Michigan Court of Appeals.
Decided January 3, 1989.
Hill, Lewis, Adams, Goodrich & Tait (by Roderick S. Coy and Nancy L. Lukey), for the Association of Businesses Advocating Tariff Equity.
Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, and Don L. Keskey and William W. Derengoski, Assistant Attorneys General, for the Public Service Commission.
Loomis, Ewert, Ederer, Parsley, Davis & Gotting (by George W. Loomis, Michael G. Oliva and Sherri A. Weller), and David A. Mikelonis and Frank R. Knox, for Consumers Power Company.
Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, and Hugh B. Anderson, Donald E. Erickson and Mary Louise Albrecht-Pridmore, Assistant Attorneys General, for the Attorney General.
*65 Before: DANHOF, C.J., and SAWYER and D.R. FREEMAN,[*] JJ.
D.R. FREEMAN, J.
These are appeals as of right directly from the Michigan Public Service Commission pursuant to MCL 462.26; MSA 22.45, as last amended by 1987 PA 12, effective March 31, 1987, by the Association of Businesses Advocating Tariff Equity and the Attorney General from the March 31, 1987, unanimous opinion and order of the Michigan Public Service Commission which ordered Consumers Power Company to refund $22,921,444 to its customers pursuant to reconciliation of Consumers' gas cost recovery plan for the twelve-month period ended December 31, 1985. These appeals were consolidated by this Court.
These cases arise under MCL 460.6h; MSA 22.13(6h), added by 1982 PA 304, which, among other things, provides for the filing of a gas cost recovery plan, annual gas cost reconciliation procedures, refunds to customers, and recovery of excess costs from customers.
It was the position of Consumers that its 1985 gas cost recovery (GCR) reconciliation had an underrecovery of $11,010,121. It was the position of the PSC staff that Consumers' 1985 GCR underrecovery was $7,952,463. It was the Attorney General's position that certain pipeline billings for production-related costs should not have been included, but should have been separated out and rebilled to customers on a historical, direct billing basis, with the result that the Attorney General said Consumers' 1985 GCR reconciliation amounted to a $42,011,474 overrecovery. ABATE'S position was similar to that of the Attorney General's, but *66 it calculated a 1985 GCR overrecovery for Consumers of $40,207,575.
Under federal legislation, specifically the Natural Gas Policy Act of 1978, 15 USC 3301 et seq., certain production-related costs associated with gas may be recovered by the producer if permitted by the Federal Energy Regulatory Commission (FERC). On July 25, 1980, FERC's orders relating to these production-related costs became effective. However, Panhandle Eastern Pipeline Company and Trunkline Gas Company, Consumers' pipeline suppliers, were not permitted to immediately pass through those costs to Consumers. In 1985, FERC did give authority to Panhandle and Trunkline to bill Consumers for these production-related costs. One pipeline billed Consumers $8,502,550, and the other pipeline billed Consumers $44,693,926.
The two pipeline companies offered Consumers the choice of a lump sum payment or twelve monthly installments with interest. Consumers chose to pay in monthly installments which generated tax benefits for the pipelines in 1984. Consumers booked these costs as 1985 GCR gas cost and proposed to include them in the 1985 reconciliation. This would provide for recovery of all but $11,010,121 of the total production-related costs.
Next, Consumers proposed to recover the $11,010,121 through an offset against the remaining Marysville oil entitlement refunds, which totaled $28,863,619. The Marysville oil entitlement refunds refer to two periods of time, November of 1974 through May of 1976, and June of 1976 through December of 1979. Consumers admitted that it had individual customer billing records back to 1980 and magnetic tapes back to 1977.
The Attorney General and ABATE opposed use of the gas-production costs billed by the pipelines as offsets to the 1985 GCR overrecovery and to the *67 Marysville refunds claiming that it was an unreasonable assessment against 1985 customers. They contended that the production-related costs were mainly the result of purchases made during 1980-84 and that historic billing should be used for such costs. The PSC staff agreed with Consumers' approach and a hearing officer found it to be the most reasonable method of handling the matter. The PSC concurred, noting:
[A]lthough the cost of setting up a rebilling system is not prohibitive, the result would be to create a situation of trying to collect production-related costs from a substantial number of customers who would have no motivation to pay those costs. The fact that, among other considerations, individual consumption data is not available for the oil entitlement refunds which cover November, 1974 through June, 1976 makes Consumers and the Staff's proposed treatment of this issue the most reasonable.
Specifically, ABATE and the Attorney General argued to the PSC that distribution of the Marysville oil entitlement refunds should be made on the basis of a 1980 distribution, since it was closer to the over-collection period of 1974-79 than was 1985, thus more nearly assuring that the ratepayers who were overcharged were reimbursed. Additionally, ABATE offered testimony that several 1985 industrial and commercial customers from the historical refund period were now alternate discount tariff customers and would not receive refunds if the 1985 distribution period were used. Nevertheless, the PSC opined:
[A]s the Staff noted and the [hearing officer] concurred, the possibility for inequity exists in the choice of any particular historical period when the actual period cannot be used, as in the situation in *68 this case since individual consumption data is not available for the actual historical period.
The Staff has quite correctly pointed out that differences in gas consumption for any particular year may negate its suitability as a proxy year. The [hearing officer] succinctly noted that if 1980 were used, there may very well be refunds to customers who were not on the system during the historical period. This argument supports Staff's contention that inequities will exist no matter which proxy year is selected. Also, the Staff properly contends that many refunds of less than $1 would result if 1980 were used, thereby increasing the likelihood of even larger amounts not being refunded. All things considered, the Commission finds that the use of 1985 as the distribution period for the Marysville Oil Entitlements Refunds is not only logical, but also the most practical choice. We are unpersuaded by the contrary arguments of ABATE and the Attorney General.
The PSC went on to find that the 1985 gas cost underrecovery should be and was offset not only by the Marysville oil entitlement refunds of $28,863,619 but also by unrefunded balances of $2,010,288. This left a total to be refunded of $22,921,444. The PSC also found that refunds should be made by bill credits for existing customers and checks issued to former customers in accordance with the standardized refund procedures of Consumers. Rights to any portion of this refund however were not to vest immediately. Indeed, the PSC'S order reads in part:
Rights to any portion of this refund shall not vest until a refund amount has been credited to a customer's bill or a refund check to a customer or former customer has been negotiated.
There are two pertinent provisions of 1982 PA 304. MCL 460.6h(13); MSA 22.13(6h)(13) states:

*69 In its order in a gas cost reconciliation, the commission shall require a gas utility to refund to customers or credit to customers' bills any net amount determined to have been recovered over the period covered in excess of the amounts determined to have been actually expensed by the utility for gas sold, and to have been incurred through reasonable and prudent actions not precluded by the commission order in the gas supply and cost review. Such refunds or credits shall be apportioned among the customers of the utility utilizing procedures that the commission determines to be reasonable. The commission may adopt different procedures with respect to customers served under the various rate schedules of the utility and may, in appropriate circumstances, order refunds or credits in proportion to the excess amounts actually collected from each such customer during the period covered. [Emphasis added.]
MCL 460.6h(14); MSA 22.13(6h)(14) provides in part:
Such amounts in excess of the amounts actually recovered by the utility for gas sold shall be apportioned among and charged to the customers of the utility utilizing procedures that the commission determines to be reasonable. The commission may adopt different procedures with respect to customers served under the various rate schedules of the utility and may, in appropriate circumstances, order charges to be made in proportion to the amounts which would have been paid by such customers if the amounts in excess of the amounts actually recovered by the utility for gas sold had been included in the gas cost recovery factors with respect to such customers during the period covered. Charges for such excess amounts shall be spread over a period that the commission determines to be appropriate. [Emphasis added.]
The PSC decision to permit Consumers to recover FERC-approved production-related costs in the 1985 *70 reconciliation case was reasonable. As pointed out in the PSC opinion, while the costs of rebilling customers directly for the 1980-84 period was not prohibitive, there was a major enforcement problem since the result would be a situation in which Consumers was trying to collect money from a large number of customers who would have no motivation to pay those costs. The hearing officer in her proposal for decision said that the large number of customers affected by a Consumers billing made the alternatives different from those of the pipeline companies.
In Buildings Owners & Managers Ass'n of Metropolitan Detroit v Public Service Comm, 131 Mich App 504, 517; 346 NW2d 581 (1984), aff'd 424 Mich 494; 383 NW2d 72 (1986), this Court said: "The reviewing court is to give due deference to defendant commission's administrative expertise and is not to substitute its judgment for that of defendant commission." (Emphasis added.)
Further, the Attorney General has not presented a convincing argument that the PSC erred with regard to imposing retroactive costs for non-jurisdictional sales upon jurisdictional customers of Consumers. This is simply one of the inequities that the PSC considered when deciding to permit certain production-related costs in the 1985 reconciliation even though this did not bring about fairness for all concerned. The PSC exercised its administrative expertise and determined that there was less inequity in allowing recovery of certain production-related costs in the 1985 reconciliation than in disallowing them.
Additionally, the PSC did not err in permitting Consumers to offset underrecovery in its 1985 reconciliation against the Marysville oil entitlement refunds received that same year pursuant to litigation in the federal courts, even though the *71 refunds were for overcharges in 1974-79, since the PSC gave reasons which were supported by expert testimony. Any year chosen for distribution would result in some inequity since the particular historical period could not be used due to lack of actual data for that period. Using the 1985 data increased the likelihood of larger amounts actually being refunded than using the 1980 distribution period. This is exactly the kind of issue which should be resolved by the PSC based on its administrative expertise, not by the courts. Building Owners & Managers Ass'n of Metropolitan Detroit, supra.
Further, this Court has written in Great Lakes Steel Division of National Steel Corp v Public Service Comm, 130 Mich App 470, 481; 344 NW2d 321 (1983), lv den 419 Mich 895 (1984):
In any event, it was for the PSC to weigh the conflicting opinion testimony of the qualified ("competent") experts to determine how the evidence preponderated on this point. See Aquilina v General Motors Corp, 403 Mich 206, 211-212; 267 NW2d 923 (1978). Expert opinion testimony is "substantial" if offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree. To hold otherwise would thus neutralize all expert testimony in cases of conflict and the party with the burden of proof would automatically lose. Const 1963, art 6, § 28, intends no such absurd result.
The Attorney General has also argued that the PSC cannot order the refunding of unrefunded balances arising from prior refund orders because it would be inconsistent with provisions of the Michigan Code of Escheats, and because it would in effect establish a private escheat from one group of customers in favor of another group of customers. The relevant part of the escheat statute *72 is MCL 567.15(b)(xii); MSA 26.1053(5)(b)(xii), as amended by 1983 PA 96, which reads in pertinent part:
Amounts refundable from excess or increased rates or charges heretofore or hereafter collected by a corporation for utility services lawfully furnished by it, which have been or shall hereafter lawfully be ordered refunded to consumers or other persons entitled thereto and any interest due thereon, and which have remained unclaimed by the persons entitled thereto for 7 years from the date they became payable in accordance with the final determination or order providing for the refunds.
It is the Attorney General's position that $2,010,288 in unrefunded balances were offset in this case unlawfully because they were not available for such purposes under the escheat law just quoted. He argues that the PSC attempted in this case to forfeit refund rights belonging to at least three sets of customers: (1) those who cannot be found; (2) those who failed to negotiate their checks; and (3) those customers who are entitled to a refund check of less than $2. He claims that after ordering Consumers to make refunds pursuant to the refund factors established in its prior orders, the PSC attached conditions subsequent to its order in this case in an attempt to divest refund rights that customers have obtained by virtue of the PSC's prior orders establishing refund factors and distribution periods.
The PSC does not contest the general applicability of the Michigan Code of Escheats to funds which have been finally refunded, but emphasizes that the wording in § 5(b)(xii), relied upon by the Attorney General, makes it clear that the only utility refunds which are escheatable to the state *73 are those which have remained unclaimed by "the persons entitled thereto for seven years from the date they became payable in accordance with the final determination or order providing for the refunds."
The PSC argues that Consumers' current customers are the "persons entitled" to these refunds. Ownership of a particular refund by any certain individual is subject to the conditions precedent set by the PSC in its order that the person negotiate the check. Moreover, the degree of accuracy required in allocating refunds and staff cost recovery reconciliations is governed by a statutory standard which provides for apportioning refunds in a manner deemed reasonable by the PSC, rather than requiring a perfect matching of refunds to the particular individual. Because the refunds have not gone unclaimed for seven years, and because the persons comprising the general ratepayer class are the persons entitled to the refunds, the refunds are not escheatable.
This Court holds that the PSC withheld vesting in any particular individual pending negotiation of the check or crediting the amount to the customer's utility bill. Such a restriction is reasonable and within the authority of the PSC to impose under MCL 460.6h(13); MSA 22.13(6h)(13) since this still results in a refunding to a class of ratepayers. The Attorney General has mischaracterized the required negotiation as a condition subsequent. The PSC stated that the condition is one which must be fulfilled prior to obtaining status as an "owner." The refunds were merely conditional pending negotiation. Thus, negotiation must be viewed as a condition precedent. The condition was not met. Therefore, in the case of the "unrefunded balances," no ownership right ever vested so as to finalize the refunds, and there exists no legal or *74 equitable right on the part of any particular individual to make demand for this property. For this reason, the Attorney General's contention that a private escheat has been established is inaccurate. Any individual rights to these funds remained inchoate pending fulfillment of the condition contained in the PSC order.
Additionally, there is an equitable reason for distributing the refunds to the general ratepayer class. While it is true that refunding by class may result in certain inequities on occasions where a potential recipient has moved away, it should also be noted that in years where surcharges occur, those customers who cannot be located avoid the surcharges while those remaining must pick up the surcharge tab for those no longer on the system. Since those customers who stay on the system are responsible for that part of the surcharge attributable to those who move away, it is not unfair that those remaining share in refunds attributable to those who have moved.
A refund is discretionary, created by the PSC, and delineated by the action engendering it. The PSC may establish reasonable restrictions on refund rights, although it may not retroactively revise or extinguish such rights. Here, to insure that money collected from Consumers' ratepayers benefits a similar class, the PSC directed that a right to a specific portion of the refunds provided by the order shall not vest until the refund is credited to a customer's bill or a refund check to a customer or former customer is negotiated.
The Attorney General did attempt to support his position by citing cases from other jurisdictions. However, those cases are factually distinguishable from this case.
For example, in Boswell v Whatley, 345 So 2d 1324 (Ala, 1977), there was a specific order of the *75 Alabama Public Service Commission stating that it desired all of the net refunds to be paid to customers of the utility and that no portion thereof should be allowed to remain in any special account or be allowed to escheat to the State of Alabama, whereby customers of petitioner were deprived of the benefits of the refund directed by the commission. That commission's order is apparently similar in intent to the order in the present case in that both public service commissions desired to refund unrefunded balances to customers of a gas utility rather than to have those funds escheat to the state. However, there remains a significant difference. That is the condition precedent in the PSC order in this case reading: "Rights to any portion of this refund shall not vest until a refund amount has been credited to a customer's bill or a refund check to a customer or former customer has been negotiated."
Affirmed. No costs, a public question being involved.
NOTES
[*] Circuit judge, sitting on the Court of Appeals by assignment.