ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY v
PUBLIC SERVICE COMMISSION

Docket Nos. 100702, 101252. Submitted January 29, 1988, at Lansing. Decided December 19, 1988.

Consumers Power Company entered into a contract with Tondu Energy Systems, Inc., whereby Consumers would purchase from Tondu electricity produced at a cogeneration facility to be constructed by Tondu. The contract was for a period of thirty-five years and provided that Consumers would pay 4.69 cents per kilowatt hour for electricity delivered in peak periods and 3.99 cents per kilowatt hour for electricity delivered in off-peak hours, with adjustment in later years based upon the capacity factor of the Tondu facility. Tondu sought ex parte approval by the Public Service Commission of the contract. The PSC, following receipt of comments, approved the contract, but also granted requests by the Attorney General and the Association of Businesses Advocating Tariff Equity (ABATE) for the limited purpose of examining the appropriate payment rate. Hearings were held before a hearing officer on the questions of Consumers' avoided costs resulting from the project and whether the rate had been properly calculated. The PSC ultimately found that certain of the underlying assumptions used to calculate the appropriate rate and the method by which the various factors were considered to calculate the appropriate rate were incorrect. Using what it found to be proper assumptions and the proper methodology, the PSC found that an overall average rate of 3.99 cents per kilowatt hour would be appropriate and indicated that, if Tondu submitted a new agreement which set the average capacity rate at 3.99 cents per kilowatt hour, no further action would be necessary. Tondu filed an amended agreement. ABATE appealed. Tondu filed a cross-appeal. The Attorney General filed a separate appeal and filed a motion for a stay. The Court of Appeals entered a temporary stay and ordered the parties to brief the question of the constitutionality

REFERENCES

Am Jur 2d, Public Utilities §§ 133 et seq.

See the Index to Annotations under Electricity and Electric Companies; Utilities.

of the statutory provision which makes any contract for purchased power from a qualifying facility valid and binding for ratemaking purposes even if the order approving the contract is later vacated, modified or held to be invalid unless a stay is entered by a competent court within thirty days of the PSC order approving the purchased power contract.

The Court of Appeals *held:*

1. The statutory provision requiring the securing of a judicial stay of a PSC order approving a contract for purchased power from a qualifying facility constitutes an unconstitutional infringement of the powers of the judicial branch.

2. Any method of computing a single rate to be applied over an extended period of time will almost invariably result in some degree of overpayment in the early years, but such overpayments will be balanced by underpayments in later years.

3. ABATE and the Attorney General failed to carry their appellate burden of showing that the PSC's order approving the contract was not legal or was arbitrary, capricious, unreasonable or an abuse of discretion.

4. Under these circumstances, it was appropriate for the PSC to give approval conditioned upon amendment of the rate schedule. No purpose would be served by requiring that the full administrative hearing procedure be repeated with respect to an amended contract which satisfies the PSC's determination as to the appropriate average cost.

Affirmed.

1. PUBLIC UTILITIES — APPEAL — CONSTITUTIONAL LAW — SEPARATION OF POWERS.

The statutory provision which provides that contracts for purchased power from a qualifying facility which have been approved by the Public Service Commission are valid and binding for ratemaking purposes notwithstanding that the order approving the contract is later vacated or modified unless the order of the commission is stayed or suspended by a court of competent jurisdiction within thirty days after the date of the order is unconstitutional in that it improperly infringes upon the internal procedure of the Court of Appeals in its review of commission orders (Const 1963, art 3, § 2; MCL 460.6j[13][b]; MSA 22.13[6j][13][b]).

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — PURCHASED POWER — AVOIDED COSTS — RATES.

The setting by the Public Service Commission of an appropriate maximum average cost for power purchased by a public utility

from a qualifying cogeneration facility under a long term contract necessarily involves an approximation of the costs that would be avoided by the public utility in the future; the fixing of a single maximum average price for purchased power for a multiyear contract period will normally mean that the public utility will be overpaying for delivered power in the early years of the contract, but will be underpaying for delivered power in later years.

*Hill, Lewis, Adams, Goodrich & Tait* (by *Robert A. W. Strong*), for the Association of Businesses Advocating Tariff Equity.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Don L. Keskey* and *James A. Ault,* Assistant Attorneys General, for the Michigan Public Service Commission.

*David A. Mikelonis* and *Craig A. Marks,* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Harvey J. Messing* and *Richard J. Aaron*), for Consumers Power Company.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *David E. S. Martin* and *Thomas J. Waters*), for Scott Paper Company.

*Varnum, Riddering, Schmidt & Howlett* (by *Peter Armstrong* and *Bruce Goodman*), for Tondu Energy Systems, Inc.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Hugh B. Anderson,* Assistant Attorney General, for the Attorney General.

Before: DANHOF, C.J., and MacKENZIE and P. R. JOSLYN,* JJ.

DANHOF, C.J. These appeals involve challenges

---

* Circuit judge, sitting on the Court of Appeals by assignment.

to the February 19, 1987, approval by the Michigan Public Service Commission of a contract between Consumers Power Company and Tondu Energy Systems, Inc. Pursuant to this contract, into which Consumers and Tondu entered on July 31, 1986, Consumers will purchase electricity from a facility to be developed by Tondu. This facility will also produce steam, and the steam will be sold to another corporate customer pursuant to a contract not subject to psc approval. The term of the project will be thirty-five years, and Consumers will only be obligated to pay for energy actually delivered.

Tondu applied for immediate ex parte approval by the psc of the July 31, 1986, agreement in its September 12, 1986, filing. The psc ordered that a notice of opportunity to submit comments be published during the week of September 21, 1986. Following receipt of both favorable and unfavorable comments, the psc issued its "order approving application and notice of hearing" on November 4, 1986. In that order, the psc approved the July 31, 1986, agreement for purposes of compliance and consistency with the Public Utility Regulatory Policies Act of 1978 (purpa), PL 95-617, 92 Stat 3117. The psc further granted requests for hearing made by the Attorney General and the Association of Businesses Advocating Tariff Equity (abate) for the limited purpose of examining the appropriate capacity payment rate at which Consumers would purchase electricity from the facility to be developed by Tondu under the July 31, 1986, agreement. The Residential Ratepayer Consortium was also to participate. The amounts set forth in the July 31, 1986, agreement were 4.69 cents per kilowatt hour (cents/kwh) for energy delivery in peak hours, and 3.99 cents/kwh for energy delivered off-peak hours, subject to adjustments in the

third and following years for operating at different capacity factors. The higher the capacity factor at which Tondu could operate its facility (the more efficiently it could operate), the higher the payment would be. The "break-even" capacity was 76.8 percent of the theoretical maximum.

The PSC also noted in its November 4, 1986, order that Consumers' payments to Tondu were different from rates filed with the PSC by Consumers in annual avoided cost filings. These annual filings set forth the price at which Consumers would purchase electricity from certain facilities. The relationship of Consumers' annual avoided costs and the rate it should pay Tondu, as well as other aspects of its avoided cost filings, were contested below. Since this variation could not have been addressed before Tondu's submission, the PSC indicated that it would be addressed in the hearing. Finally, the PSC directed attention in the hearing to the issue of whether the methodologies for determining a proper capacity rate had been followed. These methodologies were said to have been approved in Consumers' settlement agreement in PSC Case No. U-6798. It was a major PSC proceeding, and it was concluded by a settlement agreement adopted by the PSC's order of August 27, 1982. That settlement agreement contained a formula for determining capacity payments. Pursuant to it, the rate for payment to a qualifying facility for energy would be determined. To be a qualifying facility as defined in PURPA, a facility must be a small power producer (not relevant here) or, as is the proposed Tondu facility, a cogeneration facility—one which produces both electricity and some other form of useful energy such as steam or heat. 16 USC 796(18)(A). None of the other issues which ABATE, the Attorney General, or the Residential Ratepayer Consortium sought to be

raised were to be addressed in the scheduled hearing. Most particularly, the issue of the need for the capacity represented by the Tondu project was not to be addressed.

Following administrative hearings before a PSC hearing officer, the PSC issued its opinion and order of February 19, 1987. The PSC found the assumptions used in reaching the July 31, 1986, agreement were those contained in Consumers' June 12, 1985, avoided cost filing, with the exception that a proxy plant which played a part in the rate structure was to come on-line in 1990, not 1997. The PSC further found that the avoided capacity payment rates contained in the July 31, 1986, agreement were not reached in accordance with the U-6798 methodologies. It also concluded that Tondu and Consumers had failed to establish the propriety of several assumptions.

First, a discounting methodology was rejected. Disallowance of this methology resulted in dramatic changes in the avoided capacity rate in Consumers' June 12, 1985, avoided cost filing—3.97 cents/kwh from the prior filing was reduced, without changing one assumption, to 1.77 cents/kwh. Next, changing the start-up date for the proxy plant from 1997 to 1990 increased the avoided capacity cost from 2.97 cents/kwh to 4.69 cents/kwh.

While not rejecting use of the proxy plant methodology, the PSC found changing the start-up date resulted in radical swings of the indicated capacity rate and would not reflect Consumers' avoided costs over the life of the July 31, 1986, agreement. The PSC therefore found the methodology inappropriate. It also found the evidence failed to justify the rates contained in the July 31, 1986, agreement. Specifically, the PSC identified improper assumptions regarding the fixed charge rate of the

proxy plant and the projected capital cost of the project.

The PSC accepted the starting point of a $1,250/kwh capital cost at year-end 1984. However, it rejected Consumers' witness Ford's inflation factors (used to adjust the capital cost due to projected increases in construction costs) of 5.9 percent for 1985, 7.2 percent for 1986, and 6.7 percent for the period 1987 through 1990. Instead, it held that it was appropriate to use escalation rates from a Consumers' filing in Case U-8431 of between 4.0 percent and 4.2 percent through 1988, and it therefore adopted a 4.2 percent escalation rate.

The PSC next addressed the fixed charge rate. It found Consumers' value of 20.17 percent inappropriate. It cited witness Peloquin's explanation that capital costs dropped during the first half of 1986. Witness Logan's calculated fixed charge was 19.3 percent, although he did support Consumers' higher value of 20.17 percent. Consumers' fixed charge rate in its July 17, 1986, avoided cost filing was 16.1 percent. The PSC concluded a rate "more in line" with the Peloquin rate should be utilized, and found 17.5 percent a "more reasonable figure."

The PSC adopted these new figures and the other ones as contained in the July 31, 1986, agreement. Using the U-6798 methodology, the PSC developed arithmetically an average capacity rate of $39.9/mwh (megawatt hour, or one million watts) or 3.99 cents/kwh. It found the higher rates as contained in the July 31, 1986, agreement were excessive and could not be approved. However, because the PSC felt that the parties should not be left without guidance, and based on prior cases and the fact that future cases would be reviewed on a new basis anyway because the statute had been modified, the PSC indicated that, if Tondu submitted a new agreement within ninety days setting an aver-

age capacity payment of 3.99 cents/kwh or less, no further action of the PSC would be necessary and the contract would be considered approved by the PSC.

The PSC then addressed several miscellaneous issues:

1. A motion by Consumers objecting to consideration of Consumers' future capacity needs pursuant to a ruling of the hearing officer was ruled moot and not further addressed.

2. ABATE's request for official notice of facts (Consumers' Rate s) was rejected as late.

3. The question of whether the Tondu project was a qualifying facility was found to be entirely within the jurisdiction of the Federal Energy Regulatory Commission (FERC), and the PSC further noted that both the July 31, 1986, agreement and Consumers' tariffs required the Tondu project to be a qualifying facility.

The PSC then made appropriate findings and orders in accordance with its opinion. ABATE and the Attorney General sought rehearing and the PSC issued its "order denying applications for rehearing" on May 14, 1987.

Along with rejecting various attacks on its February 19, 1987, opinion and order, the PSC addressed the attack on its action in not only rejecting the filed July 31, 1986, agreement rate, but also setting forth the alternative rate which would be automatically approved. The PSC ruled such an action was within the scope of the proceeding.

On May 15, 1987, Tondu filed an amendment to the July 31, 1986, agreement providing for capacity payments of 4.36 cents/kwh for energy delivered in peak hours and 3.70 cents/kwh for energy delivered during off-peak hours. No subsequent PSC order regarding this amendment is contained in

the record; by its own terms the February 19, 1987, opinion and order approves such a rate if it constitutes an average capacity rate not exceeding 3.99 cents/kwh.

ABATE filed its appeal of right in No. 100702, and Tondu filed a timely cross appeal in that case. The Attorney General filed his appeal of right and motion for stay in No. 101252. The PSC has argued that the Attorney General's appeal of the PSC's order denying rehearing was untimely and should be dismissed. At the time the argument was made, this Court was split on the issue, but it has now been resolved contrary to the PSC's position. *Attorney General v Public Service Comm*, 429 Mich 248; 414 NW2d 687 (1987). ABATE did not move for a stay in No. 100702, but has argued herein as an opponent of § 6j(13)(b), MCL 460.6j(13)(b); MSA 22.13(6j)(13)(b), and against the constitutionality of the stay provision of that section. Scott Paper Company intervened in both cases and this Court ordered the cases consolidated.

The stay provisions of § 6j(13)(b) of 1939 PA 3, as amended by 1987 PA 81, MCL 460.6j(13)(b); MSA 22.13(6j)(13)(b) [§ 6j(13)(b)], are of importance in understanding the first issue addressed by this Court:

> In its order in a power supply cost reconciliation, the commission shall:
>
> *   *   *
>
> (b) Disallow any capacity charges associated with power purchased for periods in excess of 6 months unless the utility has obtained the prior approval of the commission. If the commission has approved capacity charges in a contract with a qualifying facility, as defined by the federal energy regulatory commission pursuant to the public utilities regulatory policies act of 1978, Public Law 95-617, 92 Stat. 3117, the commission shall not disal-

low the capacity charges for the facility in the power supply cost reconciliation unless the commission has ordered revised capacity charges upon reconsideration pursuant to this subsection. *A contract shall be valid and binding in accordance with its terms and capacity charges paid pursuant to such a contract shall be recoverable costs of the utility for ratemaking purposes notwithstanding that the order approving such a contract is later vacated, modified, or otherwise held to be invalid in whole or in part if the order approving the contract has not been stayed or suspended by a competent court within 30 days after the date of the order, or within 30 days of the effective date of the 1987 amendatory act that added subsection (19) if the order was issued after September 1, 1986, and before the effective date of the 1987 amendatory act that added subsection (19).* The scope and manner of the review of capacity charges for a qualifying facility shall be determined by the commission. Except as to approvals for qualifying facilities granted by the commission prior to June 1, 1987, proceedings before the commission seeking such approvals shall be conducted as a contested case pursuant to chapter 4 of the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969. The commission, upon its own motion or upon application of any person, may reconsider its approval of capacity charges in a contested case hearing after passage of a period necessary for financing the qualifying facility, provided that:

(i) The commission has first issued an order making a finding based on evidence presented in a contested case that there has been a substantial change in circumstances since the commission's initial approval; and

(ii) Such a commission finding shall be set forth in a commission order subject to immediate judicial review. The financing period for a qualifying facility during which previously approved capacity charges shall not be subject to commission reconsideration shall be 17.5 years, beginning with the

date of commercial operation, for all qualifying facilities, except that the minimum financing period before reconsideration of the previously approved capacity charges shall be for the duration of the financing for a qualifying facility which produces electric energy by the use of biomass, waste, wood, hydroelectric, wind, and other renewable resources, or any combination of renewable resources, as the primary energy source. [Emphasis added.]

Under § 6j(13)(b), one of the issues to be addressed in PSC power supply cost reconciliation proceedings is capacity charges for power purchased from such cogeneration facilities such as those proposed to be provided by Tondu. Capacity charges for power purchased for more than six months are to be disallowed absent prior PSC approval. This section provides, in that part relevant for purposes of the matters immediately before this Court, that, as to a contract approved by the PSC, the contract shall be valid and binding in accordance with its terms and capacity charges paid pursuant to the contract shall be recoverable for utility ratemaking purposes, notwithstanding that the order is subsequently vacated, modified, or otherwise held invalid, unless the PSC's order of approval is stayed or suspended within thirty days of the date of the order. The approval is not subject to PSC reconsideration for 17.5 years or for the duration of the financing for various qualifying facilities.

Since some PSC approval orders, as here, were entered prior to the statute's effective date of June 29, 1987, the statute provides that such orders are automatically deemed to be effective for utility ratemaking purposes, notwithstanding any later court actions purporting to invalidate the order, unless the PSC order was stayed or suspended

within thirty days of the effective date of the act, July 29, 1987.

Following the filing of this appellate challenge to the February 19, 1987, order, in response to the Attorney General's motion for stay, on July 24, 1987, this Court issued a temporary stay. By its order of August 18, 1987, this Court directed the parties to address the constitutionality of § 6j(13)(b).

As a preliminary matter, we note that, absent the operation of § 6j(13)(b), the motion for stay is without merit because the Attorney General and ABATE have made no showing of irreparable harm. Since the operation of § 6j(13)(b) in the absence of a stay would render this Court's appellate review moot or nugatory, this Court directed the parties to brief the question of the constitutionality of § 6j(13)(b), in that the very functioning of this Court was called into question. Cf., *Jeannette v Stadium Management Co,* 117 Mich App 240, 244-245; 323 NW2d 308 (1982). It was the apparent encroachment of the Legislature on this Court's internal procedures which gave rise to the concern, led to the order for briefing, and presented a colorable claim of violation of Const 1963, art 3, § 2. It is this separation of powers argument to which attention is first given. While the prohibition of the Legislature's exercise of judicial power is set out in art 3, § 2, the vesting of judicial power in Michigan's one court of justice occurs in Const 1963, art 6, § 1. Moreover, it is in Const 1963, art 6, §§ 5, 10 that the Supreme Court's exclusive power to prescribe practice and procedure in this Court is set forth. Thus, the separation of powers argument of art 3, § 2 incorporates these article 6 judicial provisions, and further reference to art 3, § 2 incorporates those article 6 judicial provisions.

Practice and procedure in Michigan's courts is

constitutionally confided to the Supreme Court. *Gruskin v Fisher,* 405 Mich 51, 58; 273 NW2d 893 (1979), reh den 406 Mich 1117 (1979). The question must be, then, whether there is something inherent in this Court's practice and procedure, as prescribed by the Supreme Court, which reserves to this Court itself the right to issue stays without any particular time limit. More particularly, the question is whether there is a violation of art 3, § 2 when there is a restrictive time limit and violation of that time limit results in loss of subject matter jurisdiction as is presented by § 6j(13)(b).

We note in approaching the statute the strong presumption of constitutionality of statues, *People v McQuillan,* 392 Mich 511; 221 NW2d 569 (1974). Given the minimal requirement for this Court to safeguard its own jurisdiction, namely, issuance of a stay within thirty days of the filing of the request for review, can such a minimal intrusion, even if it amounts to dictation of a rule of practice and procedure, raise a sufficient ground to overcome the presumption of constitutionality? If the time limit is allowable, then probably some lesser time limit is also allowable. A time period in which a litigant has to file a case is jurisdictional; such a statute of limitations is obviously within the Legislature's power. However, once jurisdiction has attached, the time for decision is different.

This is a case of first impression in Michigan. Examination of the Supreme Court's consideration of the Open Meetings Act in *In re 1976 PA 267,* 400 Mich 660; 255 NW2d 635 (1977), is instructive. In this communication addressed to the Governor, President of the Senate and Speaker of the House of Representatives, the Court outlined, with reference to art 3, § 2, the broad and exclusive scope of judicial authority in regard to court practice and

procedure and noted that it included rulemaking, supervisory and other administrative powers, as well as traditional adjudicative ones. The Court stated, 400 Mich 663:

> The judicial powers derived from the Constitution include rulemaking, supervisory and other administrative powers as well as traditional adjudicative ones. They have been exclusively entrusted to the judiciary by the Constitution and may not be diminished, exercised by, nor interfered with by the other branches of government without constitutional authorization. See *Attorney General ex rel Cook v O'Neill,* 280 Mich 649; 247 NW 445 (1937).

Based on that precedent, the Supreme Court announced that purported applicability of the Open Meetings Act to the Court when exercising rulemaking authority and while deliberating or deciding upon the issuance of administrative orders was an impermissible intrusion into the most basic day-to-day exercise of constitutionally derived judicial powers. *Id.* Here, the constitutionally prohibited intrusion is greater both as to the applicability of the rule and as to the nature of the intrusion.

As to the applicability, with the Open Meetings Act, the core adjudicative function of the Supreme Court was not even implicated. Instead, important but historically secondary functions of rulemaking, supervision and other administrative powers were addressed. In the instant case, the subject of the Legislature's intrusion is this Court's adjudication of its own cases, properly pending before it. Our administration of our own docket is also impaired by § 6j(13)(b).

As to the nature of the intrusion, with the Open Meetings Act the intrusion was not so great as to

be prohibitive. While we in no way wish to be understood as questioning the problems which the Supreme Court might experience in having rule-making and administrative order conferences only in accordance with the Open Meetings Act, it must be realized that all manner of public bodies in fact operate in exactly that fashion pursuant to the act. Thus, the Supreme Court's capacity to function would be infringed but would not be foreclosed. In contrast, given the thirty-day provision, if this Court did not stay the PSC order of which review was being sought, there could be no further effective review by this Court or the Supreme Court. In summary, the Supreme Court was unanimously of the opinion that application of the Open Meetings Act to it violated art 3, § 2, and § 6j(13)(b) is more intrusive than that act.

The manner in which § 6j(13)(b) violates art 3, § 2 is also illustrated in *Clemons v Detroit Dep't of Transportation,* 120 Mich App 363; 327 NW2d 480 (1982). At issue in *Clemons* was 1980 PA 190, as it amended MCL 600.641(2); MSA 27A.641(2), which allowed district judges to "re-remand" a case to circuit court if:

(1) the case had been remanded from the circuit court to the district court under MCL 600.641; MSA 27A.641, as appearing to have damages less than $10,000; and

(2) the district judge held a hearing, and at the conclusion of the hearing it was shown that the damages may exceed $10,000.

The rule which was established in *Clemons* was that the Legislature could determine "what" could be brought as a case, but the Supreme Court, pursuant to Const 1963, art 6, § 5, could determine "how" the action was to be brought. The Legislature here clearly provided for appeals of PSC cogeneration approvals and even for their stay by a

reviewing court. What is further attempted under § 6j(13)(b) was a proscription on "how" such a stay and review could proceed. This amounts to an attempted exercise of the Supreme Court's power by the Legislature, contrary to art 3, § 2.

Appellees make an argument, appealing on its face, which suggests that, since this Court can always protect its authority to function by issuing a stay as a matter of policy, automatically and in every case where § 6j(13)(b) would apply, there is no unwarranted intrusion into this Court's procedure. However, it is exactly this legislative intrusion, dictating this Court's internal procedure, which constitutes the violation of art 3, § 2.

Appellees argue, in various contexts, that all the Legislature has done is limit available remedies, which is justifiable under numerous authorities. However, this Court's scope of review and capacity to render broad relief as necessary on the facts of any case will, if a stay is entered within thirty days, be absolutely unaffected by § 6j(13)(b). It is not the available remedies which are diminished, it is the availability of the remedies. This precise dichotomy between substance and procedure is what is at issue in this case.

The scope of appellate review was addressed in *City of Dearborn v Michigan Turnpike Authority,* 344 Mich 37; 73 NW2d 544 (1955). At issue there was a statute providing for expedited and limited review of a determination of the Turnpike Authority to locate turnpikes and terminals, choose materials, make plans and specifications, make other similar operational decisions, and sell bonds for payment of the costs of a turnpike. Factual determinations were not subject to review by the courts. However, that same section, MCL 252.124; MSA 9.1095(24), provided that courts were not deprived of jurisdiction of any violation of the Turnpike

Authority Act or from consideration of any question of interpretation of law. The foregoing section was held not to violate articles 4 and 7 of the 1908 Constitution, which dealt with division of powers and establishment of the judicial department. 344 Mich 65-66. The Supreme Court also considered the expedited process for bond validation, followed by a twenty-day appeal period, both of which were set by the statute. They were found not violative of the provision for separation of powers under Const 1908, art 4, § 2.

Taking the last portion first, the jurisdictional time limit for taking appeals is confided to the Legislature, Const 1963, art 6, § 10. There is no separation of powers problem. As to the prohibition on review of factual determinations, the instant case does not represent a limitation on the scope of factual review, because, as indicated above, once the stay is entered this Court can review as in any other case.

Arguments have also been made based on *McAvoy v H B Sherman Co,* 401 Mich 419; 258 NW2d 414 (1977). However, appellees have misperceived the "seventy percent rule," MCL 418.862; MSA 17.237(862). That statute does not purport to prohibit the Workers' Compensation Appeal Board, this Court, or the Supreme Court from staying payments of seventy percent of the weekly benefit required by the terms of a workers' compensation hearing referee's award. The statute solely provides that filing a claim for review of the referee's award does not operate as a stay of payment of seventy percent of the weekly benefit required by the terms of the hearing referee's award.

It is true that MCL 460.301(7); MSA 22.101(7) has a limitation provision as regards issuance of bonds by a utility which is very similar to § 6j(13)(b). If the PSC's order approving issuance of

such bonds is not stayed or suspended by the reviewing court before issuance, which issuance shall not precede the expiration of thirty days from the PSC's order, then the bonds remain the binding obligation of the utility notwithstanding that the PSC's order is later vacated, modified or otherwise held invalid in whole or in part. While that statute was addressed in *Attorney General v Public Service Comm,* 412 Mich 385; 316 NW2d 187 (1982), no claim that it violated art 3, § 2 was raised and no holding as to its constitutional validity is contained in that case.

Appellees argue that the Legislature's methodology for reviewing its own statute is a reason § 6j(13)(b) does not violate art 3, § 2. Appellees fail to explain why a "sunset" or expiration provision, MCL 460.6j(19); MSA 22.13(6j)(19), providing for review by legislative committees every five years, somehow means the separation of powers violation is or is not present.

Further argument is based on *Michigan Ass'n of Railroad Passengers v Southeastern Michigan Transportation Authority,* 140 Mich App 111; 362 NW2d 904 (1985). There is no question that, under authorities cited within that case and on authority of the holding of that case, the Legislature, by MCL 124.407; MSA 5.3475(107), precluded certain equitable relief from the courts, although the statute does provide for a plain, adequate and complete remedy at law. This Court also directly held in *Michigan Ass'n of Railroad Passengers* that preclusion of one remedy was not unconstitutional as a denial of "judicial independence," but this was specifically because alternative remedies were available. Again, this line of authority addresses the scope of the remedy available, not how intrusive the Legislature may be in dictating how a court exercises the authority given.

In summary, by one means or another, appellees characterize operation of the stay or lack thereof under § 6j(13)(b) as a "remedy" and then show numerous reasons why elimination of or modification of a remedy is not constitutionally impermissible. We believe § 6j(13)(b) represents an attempt by the Legislature to dictate procedure, and therefore, to the extent it prohibits appellate relief unless a stay is entered within thirty days of the order from which appeal is sought or from the effective date of the statute, it is violative of art 3, § 2. This provision is severable from the remainder of § 6j(13)(b), which otherwise remains unaffected by our decision. *Robison v Wayne Circuit Judges,* 151 Mich 315; 115 NW 682 (1908).

As to the other arguments raised by the Attorney General and ABATE, this Court appreciates the efforts made by both to be responsive to this Court's order for briefing the constitutionality of § 6j(13)(b). However, none of the other arguments shows that operation of the statute results in the kind of inherent intrusion into this Court's procedures which, in our opinion, justifies sua sponte consideration as took place here. We have noted the arguments and find no merit in them,[1] and this Court's ruling is based strictly on the violation

---

[1] No specific authority mandating a finding of unconstitutionality of § 6j(13)(b) as a violation of the federal constitutional doctrine of separation of powers was cited, and we do not reach the question.

Both procedural and substantive due process guarantees are also claimed to be violated. Procedural due process guarantees have not been violated, since § 6j(13)(b) has not deprived anybody of an opportunity to be heard at a meaningful time and in a meaningful manner, *Parrat v Taylor,* 451 US 527; 101 S Ct 1908; 68 L Ed 2d 420 (1981). The substantive due process guarantee requires that legislation not be unreasonable, arbitrary or capricious, and would invalidate laws which do not have a real and substantive relationship to a permissible legislative object. See 16 Am Jur 2d, Constitutional Law, § 816, p 978. Appellate review under § 6j(13)(b) is obviously accelerated, and, of course, if grounds for a stay are not presented, then the process is foreshortened to nearly nothing. This implements a permissible object of legislative interest, namely, achieving finality in regulatory approv-

als, especially where financial implications vary greatly depending on how soon after PSC approval a particular construction project can be initiated.

Both the title-object and single purpose constitutional prohibitions of Const 1963, art 4, § 24 are claimed to have been contravened by § 6j(13)(b). The potentially-shortened appellate review is part of providing for the regulatory control of utilities, and the title of 1987 PA 81 certainly includes that as the object of the bill. Appellants also argue that the enrolled bill which became 1987 PA 81 was amended by the addition of the provision prohibiting effective judicial review and that such amendment of the bill violated the prohibition of Const 1963, art 4, § 24 against altering or amending a bill on its passage through either house of the Legislature so as to change its original purpose as determined by the total content and not alone by its title. Utility regulation easily embraces the judicial review available. This is not the introduction of entirely new and different subject matter. Instead, it is an allowable amendment or extension of the original purpose of the bill, *United States Gypsum Co v Dep't of Revenue,* 363 Mich 548; 110 NW2d 698 (1961).

As to the claimed violation of Const 1963, art 4, § 25, that § 6j(13)(b) amends or alters other sections or acts without reenacting and publishing the other sections and acts, this constitutional prohibition is not violated where an act is complete in itself. As explained in *Detroit v Jones & Laughlin Steel Corp,* 77 Mich App 465; 258 NW2d 521 (1977), lv den, 404 Mich 805 (1978), this constitutional prohibition does not apply when existing statutes are affected by subsequently-passed legislation. The evil sought to be avoided by this section is the amendment of acts by reference only. Cf., *Berrien Co v Michigan,* 136 Mich App 772; 357 NW2d 764 (1984). This constitutional prohibition does not mean that an amendatory act can alter the legal operation of existing statutes only if all those other statutes are reenacted at length, *People v Wands,* 23 Mich 385 (1871).

Finally, § 6j(13)(b) is alleged to be an impairment of the obligation of contracts in violation of the federal and state constitutional guarantees against such legislation. The contractual provision allegedly impaired is § 10(c) of the July 31, 1986, agreement, which requires Tondu to refund to Consumers capacities and/or energy payments made by Consumers to Tondu which are in excess of amounts prescribed in federal or Michigan laws, regulations or orders, or which Consumers has not been permitted to charge its customers through its electric rate as established by the PSC. Leaving aside the foreshortened period for granting a stay, which is legitimate or not depending on the separation of powers argument, there is no intrusion of the statute per se on Consumers' contractual rights. Once a timely stay is entered by this Court or the Supreme Court, there would be full appellate review before the order became final and binding, and appellants have shown no protected right to any certain procedural guarantees. Appellants have also failed to demonstrate how anybody but Consumers or Tondu would have standing to raise the argument, 16 Am Jur 2d, Constitutional Law, § 188, p 585. It may be noted, of course, that Consumers is all in favor of § 6j(13)(b) and does not feel its contractual rights have been unconstitutionally impaired.

of art 3, § 2 (encompassing, as explained, *supra,* the various provisions of Const 1963, art 6).

One final matter for consideration is Tondu's argument that the Attorney General has no standing to challenge the constitutionality of § 6j(13)(b), particularly since the Attorney General also, in representing the PSC, argues in favor of its constitutionality. Since ABATE is also making the challenge, and in light of the Michigan Supreme Court's practice of appointing the Attorney General to argue both sides of an advisory opinion case, cf., *Advisory Opinion on Constitutionality of 1975 PA 227 (Question 1),* 396 Mich 123, 125-126; 240 NW2d 193 (1976), we are not dissuaded from disposition of this issue.

As we turn to the other issues raised by the parties, we note that an unreasonable amount of our time was spent in this case because the appellees either were unwilling or unable to organize their briefs so as to be responsive to the arguments of the appellants. The repetitive nature of the Attorney General's arguments contributed to the problem. The parties are admonished to comply with both the letter and the spirit of MCR 7.212(D) and cautioned that in the future nonconforming briefs may be stricken by this Court under MCR 7.212(H).

The parties have argued extensively regarding the proper standard of review. However, since this case involves more than one variety of PSC decision, more than one standard of review applies. The pure decision of the methodology for determining avoided costs, as adopted through the U-6798 proceeding, is a clear example of legislative/

---

Tondu argues that the constitutional issues are not ripe. The foregoing demonstrates a lack of merit in the issues, but when this Court is faced with the motion for stay, the validity of the time limitation in § 6j(13)(b) becomes an actual controversy.

policymaking of the experimental ratemaking variety. Since federal law has mandated states to devise such methodologies, the action is lawful; and this Court has held that at least the policy advisability of the concept is beyond review, *Attorney General v Public Service Comm #2,* 133 Mich App 790, 799; 350 NW2d 320 (1984).

Other decisions, such as the choice of inputs for the formula from U-6798 or the procedural actions of the PSC, may be reviewed for lawfulness in the broader sense of the first three subparts of MCL 24.306(1); MSA 3.560(206)(1). A more general statement of the standard of review which is applicable where no hearing is required is that derived from Const 1963, art 6, § 28 and requires the reviewing court to find that the administrative agency's decision be legal and not arbitrary, capricious, unreasonable, or an abuse of discretion. *Central State Bank v Comm'r, Financial Institutions Bureau,* 136 Mich App 368, 372; 356 NW2d 642 (1984), citing *Saginaw Valley Trotting Ass'n, Inc v Michigan Racing Comm'r,* 84 Mich App 564, 572; 269 NW2d 676 (1978). Appellants must show by clear and satisfactory evidence that the PSC's approval is unlawful or unreasonable. To do so, reading in the standard from art 6, § 28 under *Central State Bank, supra,* appellants' burden would be to show by clear and satisfactory evidence that the PSC's decision was arbitrary, capricious, unreasonable, or an abuse of discretion.

Appellants raise a substantial number of attacks on the rate approved by the PSC. Preliminarily, however, we note that the highest rate the PSC was purporting to approve under the July 31, 1978, agreement was the full avoided costs for Consumers, so arguments about whether higher costs could be approved are not before the Court. Next, the PSC was applying a methodology approved in a

prior case, U-6798. ABATE was a signatory to a settlement agreement establishing that methodology, and the Attorney General participated, although not signing the settlement agreement. ABATE has shown no basis for being allowed to "reinvent the wheel" in this case, and the Attorney General and ABATE never sought an appeal in that case. This decision to use the U-6798 methodology is a policy decision reviewable only for legality, as contemplated by *Attorney General v Public Service Comm #2,* 133 Mich App 790, *supra.* The analogous methodology of reaching the major decision in one case and then applying it in subsequent "reconciliation" cases has met with approval by this Court as regards "SAIP" proceedings. *Id.*

ABATE has argued that there must be "one" avoided cost. However, we have become convinced that FERC has explicitly determined that, for the purposes of PURPA, "avoided costs" is a number subject to approximation, based on estimates, and therefore variable. The thirty-five-year contract involved in this case obviously requires estimates for events far in the future. It is to perform this very estimation process that the U-6798 methodology was established.

Under the formula for reaching the average sale price here of 3.99 cents/kwh, which approximates the price Consumers will pay Tondu for electricity over the life of the contract, it is reasonable to assume, based on the methodologies for addressing the effects of inflation built into the formula, that Consumers will probably be overpaying in the early years of the contract, but underpaying in the later years. This is precisely what FERC contemplated and authorized, as long as the overall payment approximated the avoided cost over the pe-

riod, and again that is what the U-6798 formula was established to determine.

Before this Court grants relief to appellants, we must find that they have shown by clear and convincing evidence that the PSC's decision that the stream of payments Consumers will pay Tondu from mid-1990 to mid-2025 under the approved contract will approximate Consumers' avoided costs is arbitrary, capricious, unreasonable or an abuse of discretion. However, we find appellants have failed to meet their appellate burden, having produced nothing to support such a showing, and so no relief is appropriate.

Assuming arguendo that the five errors claimed by ABATE should be considered, there is no merit demonstrated under any standard of review. First, the approved rate was properly calculated using the U-6798 rate methodology, which requires "fictitious costs." Second, the U-6798 methodology does not allow discounting, so it would be erroneous to discount, and the PSC correctly disallowed any discounting. Third, the capacity adjustment mechanism is part of the U-6798 formula, so its use is proper, not improper. Moreover, expert testimony accepted by the PSC was presented to the effect that the capacity adjustment required an improbably high level of efficiency, and would in fact probably lead to reduced payments to Tondu, not increased payments. Fourth, the factors of 18 CFR 292.304(e) were considered in producing the U-6798 formula—further consideration is unnecessary and unjustified. The PSC's manner of dealing with this issue was fully reasonable and lawful. Finally, the PSC's decision was that the year in which the capacity was needed was part and parcel of its determination, so a claim of error based on failure to address this issue is without merit.

A further error is charged by the Attorney

General based on the PSC's adoption of a fixed rate charge of 17.5 percent, a reduction from the value proposed by Consumers of 20.17 percent. The hearing officer sought the Attorney General's position on this issue, but the Attorney General refused to take a position at that time. We find the PSC did not err in upholding the hearing officer's decision barring any further presentation by the Attorney General on this issue. We also find competent, material and substantial evidence on the record supporting the value as adopted by the PSC. We do not substitute our judgment for that of the PSC when findings are so supported. *Detroit v Michigan Railroad Comm,* 209 Mich 395; 177 NW 306 (1920).

To the extent that any of the other arguments by the Attorney General require comment, the argument based on another PSC proceeding, in which the utility and cogenerator could not agree, is irrelevant. As far as argument based on excluded evidence, the Attorney General here has failed to present any basis for this Court to find error in the exclusions, simply making a conclusory allegation that the exclusion was error. Even if an unknown and unsubstantiated telephone offer for purchasing energy were to be allowed into the record, it hardly provides the kind of certainty of available power for thirty-five years that the Tondu proposal has been accepted as providing, and thus there is no reason to compare the alleged rate as offered over the telephone to the calculated Tondu rate. Finally we find appellants have failed to demonstrate the PSC erred in accepting a 4.2 percent inflation rate in the 1984 year-end costs of $1,250/kwh, both of which were supported by competent, material and substantial evidence on the whole record. The 4.2 percent factor was used in some of Consumers' prior avoided cost filings,

which is evidence of the reasonableness of that value. While the $1,250 figure was challenged, there was also credible and substantial testimony supporting even higher figures, and the $1,250 had been previously utilized by Consumers. No error is presented here. *Detroit v Michigan Railroad Comm, supra.*

ABATE has challenged the PSC's approval of Tondu's amended rates which it filed pursuant to the February 19, 1987, opinion and order. ABATE failed to raise this issue below, and thus it is waived on appeal. *Cotton v Campbell, Wyant & Cannon Foundry,* 57 Mich App 52; 225 NW2d 187 (1974). Were we to examine the procedure, however, it appears to be a reasonable and responsible regulatory practice, in a case where filed rates are rejected but alternative acceptable values are determined by the PSC, to advise the parties what rate level can be filed which will meet with approval, rather than requiring the entire process to be recommenced with the attendant extra delay and cost. The practice is particularly appropriate where, as here, future approvals will be subject to contested case procedures as provided by § 6j(13)(b). ABATE has failed to show error, even if this Court were to address the issue.

This Court's review of the record reflects that the PSC properly limited the scope of this hearing. The availability of security for Consumers should Tondu default was never raised below; appellate review is barred, *Cotton, supra.* Again, were we to address this issue, the July 31, 1986, agreement does provide for the refund of capacity charges with interest pursuant to an agreed schedule if Tondu fails to deliver energy for two years. Appellants do not explain why this is unreasonable or otherwise improper. ABATE complains of the PSC's refusal to consider facts not of record. No abuse of

the PSC's discretion in rejecting the request as untimely has been shown. Moreover, as argued by Tondu, such facts would have been irrelevant since the rates addressed concerned energy costs over an entirely different time period. ABATE also argues that the approved rates will result in unjust and unreasonable utility rates in violation of MCL 460.557; MSA 22.157 and PURPA. Appellants have failed to show that the rates approved by the PSC represented anything other than costs Consumers would have otherwise paid for the energy had it been unavailable for purchase from Tondu. No error is presented.

The Attorney General also argues that purported legislative revision of 1939 PA 3 by 1987 PA 81, whereby the "regulatory out" clause is eliminated from the July 31, 1986, agreement, vitiates the PSC's approval. The Attorney General cites no authority for this proposition, and our reading of the contract and approval reflect that Consumers must pay no more to Tondu than it can recover from its customers. The Attorney General also listed four other issues which are not briefed. We do not address them, since we find them to have been abandoned on appeal. *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959).

Finally, the Attorney General argues error in the absence of evidence on the record that Tondu was a qualifying facility. It is clear that the July 31, 1986, agreement was void if Tondu were not a qualifying facility, and it is also uncontested that Tondu has now been certified as a qualifying facility by FERC. This is shown by the FERC certification order attached to Consumers' brief. Normally, we do not allow enlargement of the record, but an exception exists where, as here, a remand for an evidentiary hearing would amount to a useless act.

*Hawker v Northern Michigan Hospital, Inc,* 164 Mich App 314; 416 NW2d 428 (1987).

Tondu's cross-appeal was "conditioned" on this Court's not affirming the PSC's orders challenged in the appeals. Since we affirm all the PSC's orders, we treat Tondu's cross-appeal as withdrawn by its own terms.

Affirmed.