ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY
v PUBLIC SERVICE COMMISSION

ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket Nos. 163930, 165005, 165713. Submitted August 10, 1995, at Lansing. Decided March 19, 1996, at 9:05 A.M.

Midland Cogeneration Venture Limited Partnership (MCV) filed an application with the Public Service Commission for approval of a contract to supply to Consumers Power Company electricity produced at MCV's gas-fired cogeneration plant. Under the Public Utility Regulatory Policies Act, PL 95-617, 92 Stat 3117, utilities such as Consumers Power were required to purchase power from qualifying facilities consisting of small power-production plants and cogeneration plants such as MCV. The PSC docketed MCV's application as Case No. U-8871 and consolidated it with applications from other qualifying facilities that sought to sell power to Consumers Power. On the basis of a coal-fired plant model, the PSC approved capacity charges of 1,160 megawatts (MW) at an avoided capacity rate of 3.77 cents per kilowatt hour (kWh) for Consumers Power purchases from qualifying facilities, with payments backloaded, i.e., reduced at the beginning and increased at the end. The PSC gave Consumers Power ninety days to sign contracts with qualifying facilities. The Court of Appeals, SAWYER, P.J., and HOOD and MURPHY, JJ., affirmed in part and reversed in part, holding that the PSC properly exercised authority pursuant to MCL 460.6j; MSA 22.13(6j) and properly determined avoided capacity costs and future capacity needs on the basis of a coal-fired plant model. The Court of Appeals remanded the matter to the PSC for a determination of the avoided capacity cost on the date the contract was signed and for clarification of whether the factors in 18 CFR 292.304(e) were considered in setting avoided costs. *Consumers Power Co v PSC*, 189 Mich App 151 (1991). As part of Consumers Power's annual power supply cost recovery cases, the PSC limited Consumers Power's power supply cost recovery charges to the backloaded qualifying facilities rate established in Case No. U-8871. The Court of Appeals, SHEPHERD, P.J., and WAHLS and R. B. BURNS, J., affirmed. *Consumers Power Co v PSC*, 192 Mich App 180 (1991). The PSC limited Consumers Power's authorized charges to power actually delivered by,

not for all available capacity from, qualifying facilities. The Court of Appeals, WAHLS, P.J., and SULLIVAN and MURPHY, JJ., affirmed. *Consumers Power Co v PSC No 1*, 196 Mich App 436 (1992). On remand pursuant to *Consumers Power Co v PSC*, 189 Mich App 151 (1991), Case No. U-8871 and other cases were settled in Case No. U-10127 following a contested-case hearing pursuant to procedure provided in 1992 AACS R 460.17333. Under the settlement, Consumers Power was given a choice between two options. Consumers Power chose the option under which it would utilize power from MCV whenever available, regardless of the availability of power from other qualifying facilities, and would recover costs at 3.62 cents per kWh but limited to 88.7 percent of the first 915 MW of power taken from MCV. The PSC declined to set a reserve margin lower than the twenty-three percent margin approved in Case No. U-8871. The Association of Businesses Advocating Tariff Equity (ABATE) and the Attorney General appealed. The appeals were consolidated.

The Court of Appeals *held:*

1. ABATE failed to prove by clear and satisfactory evidence that the rates established by the PSC were unlawful or unreasonable. The occasional use of power from MCV at times when MCV is not the most economical source of power actually resulted in savings to ratepayers under the terms of the settlement.

2. The option proposed by the PSC and chosen by Consumers Power, in particular the rate of cost recovery and the reserve margin, were supported by competent, material, and substantial evidence on the record. ABATE presented no authority in support of the proposition that the PSC could consider and implement only those modifications that were suggested by the parties.

3. The PSC did not act arbitrarily or capriciously and did not deny ABATE due process in striking proffered testimony demonstrating that the rate structure in the settlement discriminated against high-load-factor customers. The PSC properly determined that the testimony was outside the proper scope of the proceedings. The issue of the fairness of the rate structure was addressed in Case No. U-8871 and will be addressed in a rate case or contested case in the future.

4. Contrary to the Attorney General's claim, the PSC did not fail to consider whether the settlement was fair, just, reasonable, and in the public interest in light of available alternatives. The record included evidence in support of the reduction of the capacity rate from 3.77 cents per kWh to 3.62 cents per kWh, including evidence that such reduction would result in savings.

5. The record included evidence supportive of the increase in chargeable capacity to ratepayers from 1,160 MW to 1,199 MW and of the avoided cost rates approved for this additional capacity.

6. The PSC complied with the directives of the Court of Appeals regarding calculation of the avoided cost as of the contract signing and clarification of whether the factors of 18 CFR 292.304(e) were considered by the PSC.

Affirmed.

*Hill Lewis* (by *Roderick S. Coy* and *Timothy P. Collins*), for Association of Businesses Advocating Tariff Equity.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Luis F. Fernandez, Larry F. Brya*, and *Robert L. Mol*, Assistant Attorneys General, for the Attorney General.

*Don L. Keskey* and *Henry J. Boynton*, Assistant Attorneys General, for the Public Service Commission.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C.* (by *William D. Parsley, Harvey J. Messing*, and *Gary L. Field*), and *David A. Mikelonis* and *Jon R. Robinson*, for Consumers Power Company.

*Conner & Bentley, P.C.* (by *Pat D. Conner*), and *Robert C. Evans*, for Michigan Cogeneration Partners.

*Foster, Swift, Collins & Smith, P.C.* (by *Stephen O. Schultz* and *Steven H. Lasher*), for Midland Cogeneration Venture Limited Partnership.

*Fraser Trebilcock Davis & Foster, P.C.* (by *David E. S. Marvin* and *Thomas J. Waters*), for Dow Chemical Company, Grand River Equities, Indeck Energy Services of Otsego, Inc., and Michigan Power Limited Partnership.

Before: MARILYN KELLY, P.J., and CORRIGAN and C. D. STEPHENS,* JJ.

MARILYN KELLY, P.J. This dispute began more than five years ago and now occupies over 19,000 pages of testimony and more than 500 exhibits presented at hearings before the Michigan Public Service Commission (MPSC). In Docket Nos. 163930 and 165713, appellant Association of Businesses Advocating Tariff Equity (ABATE) appeals from MPSC orders entered on March 31, 1993 and May 26, 1993 deciding issues on remand and denying rehearing, respectively. In Docket No. 165005, appellant Attorney General (AG) appeals from the same orders. We affirm.

### THE BACKGROUND OF THE APPEALS

In 1978, Congress enacted the National Energy Act, which was designed to combat the nationwide energy crisis. Part of the Act is known as the Public Utility Regulatory Policies Act. Section 210 of the Act, found at 16 USC 824a-3, was designed to ease the crisis by encouraging the development of small power production facilities. Section 210(a) directed the Federal Energy Regulatory Commission to promulgate regulations requiring utilities to buy electricity from qualifying cogeneration and small power production facilities (QFS). Under the Commission's regulations, particularly 18 CFR 292.304, utilities are required to purchase power from QFs at full "avoided cost." Avoided cost is the cost to a utility of energy or capacity, or both, which the utility would have generated for itself or purchased from another facility but for the purchase from the QF. Avoided cost is defined

---

* Circuit judge, sitting on the Court of Appeals by assignment.

as either avoided energy or avoided capacity costs. The former is the cost associated with the production of energy. The latter is the cost associated with providing the capability to deliver energy.

The Midland Cogeneration Venture (MCV) is a limited partnership formed for the purpose of constructing and operating a gas-fired cogeneration plant. On September 10, 1987, MCV filed an application with the MPSC for approval of capacity charges in a contract for the sale of electricity to Consumers Power Company (CP). The MPSC docketed MCV's application as Case No. U-8871, and consolidated it with other applications from QFs and complaints against CP.

In an interim order issued on January 31, 1989, the MPSC made the finding that CP needed a QF capacity of 1,290 megawatts (MW), but reduced that figure out of caution to 1,160 MW. The MPSC based this figure on a projected 1997 need, as determined by a coal-fired plant model, called a proxy. The MPSC determined that CP was entitled to recover from ratepayers an avoided capacity rate of 3.77 cents per kilowatt hour (kWh). The payments would be backloaded, i.e., reduced at the beginning and increased at the end of the project. The MPSC gave CP ninety days to negotiate and sign contracts with its QFs.

In the appeals before us, CP, MCV, the AG, ABATE and other parties appealed as of right from the MPSC's series of orders. In *Consumers Power Co v Public Service Comm*[1] (*Consumers Power I*), this Court affirmed in part and reversed in part the MPSC's orders. We held that the MPSC properly exercised its authority acting pursuant to MCL 460.6j; MSA

---

[1] 189 Mich App 151; 472 NW2d 77 (1991).

22.13(6j). It appropriately determined the avoided capacity cost which could be passed on to ratepayers, the future capacity needs, the avoided costs using a hypothetical coal-fired facility and a rate structure. We found that clear and satisfactory evidence supported the use of a hypothetical coal-fired plant to determine CP's future avoided capacity costs.

We also found that the determination that 1,160 MW of new capacity would be needed in the future was supported by the evidence. We ruled that the avoided capacity charge adopted by the MPSC was supported by the evidence. We stated that the MPSC should deny approval of CP's contract with MCV only if the negotiated rate of 4.15 cents/kWh exceeded the avoided capacity cost when the agreement was signed. We then remanded the case to the MPSC for a determination of the avoided capacity cost on the date the contract was signed. We directed that the MPSC clarify whether all factors contained in 18 CFR 292.304(e) were considered in setting avoided cost.

In March, 1990, MCV began selling power under the unapproved 1987 contract with CP. CP filed a series of annual power supply cost recovery cases. In a temporary order dated December 21, 1989, the MPSC limited CP's power supply cost recovery charges to the backloaded QF rate established in Case No. U-8871. In *Consumers Power Co v Public Service Comm*,[2] this Court affirmed the temporary order. In a series of other orders, the MPSC limited CP's authorized charges to 3.77 cents/kWh, and allowed CP to charge only for energy actually delivered, not for all available capacity. Various parties appealed as of right.

---

[2] 192 Mich App 180; 481 NW2d 1 (1991).

In *Consumers Power Co v Public Service Comm No 1*,[3] this Court affirmed those orders. We held that the MPSC was not required to accept new evidence regarding the reasonableness and prudence of the capacity charges in the contract between CP and MCV. Rather, the MPSC was entitled to rely on evidence produced in Case No. U-8871, where those issues had been litigated.

### THE REVISED SETTLEMENT PROPOSAL

Pursuant to the remand in *Consumers Power I, supra,* CP, ABATE and the MPSC staff filed a joint stipulation in a number of cases, including Case No. U-8871. The MPSC rejected the stipulation on the basis that it allowed CP to pick and choose among the findings in Case No. U-8871. Following the rejection of the stipulation, the MPSC instructed its staff to attempt to negotiate a settlement. On September 8, 1992, CP, the MPSC staff and several QFs filed a revised settlement proposal. The case was docketed as Case No. U-10127.

The MPSC held a contested case hearing in Case No. U-10127. The procedure was conducted pursuant to the MPSC's Rule 333, 1992 AACS R 460.17333. Rule 333 provides:

> (1) All parties to proceedings before the commission are encouraged to enter into settlements when possible and the provisions of these rules shall not be construed in any way to prohibit settlements.
>
> (2) The parties to a proceeding may agree upon some or all of the facts. The agreement shall be evidenced by a written stipulation filed with the commission or entered upon the record. The stipulation shall be regarded and used as evidence in the proceeding.

---

[3] 196 Mich App 436; 493 NW2d 902 (1992).

(3) When a written settlement agreement is proposed by some of the parties, it shall be served on all parties to the proceeding. Each party shall file and serve on all parties, within 14 days after being served, its agreement, objection, or nonobjection to the settlement agreement. Failure to respond in writing within 14 days, unless a different time is set by the presiding officer for good cause, shall constitute nonobjection to the settlement agreement. A party who objects to a settlement agreement shall state those objections with particularity and shall specify how it would be adversely affected by the settlement agreement.

(4) In every proceeding, the parties to the settlement agreement shall, upon request, submit a proposed order to the presiding officer.

(5) The commission may approve a settlement agreement if all of the following conditions are met:

(a) Any party that has not agreed to the settlement has signed a statement of nonobjection or has failed to object within the 14 days provided in subrule (3) of this rule, or such other time established by the presiding officer, or the objecting party or parties under subrule (3) have been given a reasonable opportunity to present evidence and arguments in opposition to the settlement agreement.

(b) The commission finds that the public interest is adequately represented by the parties who entered into the settlement agreement.

(c) The commission finds that the settlement agreement is in the public interest, represents a fair and reasonable resolution of the proceeding, and, if the settlement is contested, is supported by substantial evidence on the record as a whole.

(6) The nature and extent of the precedential value accorded an order approving a settlement agreement shall be as specified by the parties in the settlement agreement.

The MPSC granted CP's request to incorporate the record in Case No. U-8871. MCV filed a statement indicating that it did not object to the revised settlement proposal.

In an order entered on March 31, 1993, the MPSC approved the proposal with modifications. Finding that the proposal was a continuation of Case No. U-8871, the MPSC defined the scope of the hearings in Case No. U-10127 as an examination of which of two choices would better serve the public interest: the proposal or the status quo, represented by Case No. U-8871 as it stood after the decision in *Consumers Power I, supra.*

In the body of the March 31, 1993, order the MPSC addressed numerous arguments. It rejected the AG's contention that a hypothetical gas-fired proxy should be adopted to determine CP's avoided costs, finding that such a proxy would not necessarily be less expensive. The evidence showed that, over a period of twenty to thirty years, a coal-fired plant is only slightly more costly. The MPSC concluded that, when other assumptions were made, abandonment of the coal-fired proxy adopted in Case No. U-8871 could not be justified.

It found that the increase in capacity to 1,199 MW provided by the revised settlement proposal was fair and reasonable. The addition of 39 MW to the 1,160 MW approved in Case No. U-8871 still did not exceed the original allotment of 1,290 MW. It found that the rates provided by the proposal, specifically 3.77 cents/kWh for MCV and the same or lower rates for the other projects, were within the parameters of Case No. U-8871.

The MPSC determined that the proposal provided the opportunity to resolve the remand issues resulting from *Consumers Power I, supra.* The rates agreed to by the independent cogenerators were consistent with the findings in Case No. U-8871, and were below

CP's avoided costs calculated at the time the cogenerators incurred their obligations. The MPSC found that it was not required to quantify the effect of each factor in 18 CFR 292.304(e) to demonstrate that it had considered each to the extent practicable.

The MPSC modified provisions of the revised settlement proposal dealing with recovery of capacity charges. Based on its finding that the proposal allowed CP to recover MCV payments in excess of the avoided costs of a coal-fired proxy plant, the MPSC offered CP two options. Under the first, CP would be allowed to recover 3.62 cents/kWh for available capacity up to eighty percent of 915 MW. This rate represented the avoided cost for a proxy coal plant based on an expected availability of eighty percent, rather than on its expected capacity factor. The option would allow full recovery of the avoided cost of 915 MW of coal-fired capacity.

Under the second option, MCV would be utilized whenever it was available, up to the limits specified in the revised settlement proposal applied to 915 MW of capacity. CP would recover 3.62 cents/kWh for capacity. That rate provided a 0.15 cents/kWh reduction from the 3.77 cents/kWh approved in Case No. U-8871. Payments would be based on actual energy delivered, rather than on availability. Consumers could choose to run MCV out of economic order.

The MPSC declined to set a reserve margin (capacity over and above the forecasted peak demands) lower than the twenty-three percent margin approved in Case No. U-8871. It acknowledged that CP's agreement not to seek a margin above twenty percent was a small concession, as its own studies showed that a twenty percent margin was adequate. However, the

MPSC reasoned that the higher margin should be retained to avoid the possibility that the proponents would withdraw the revised settlement proposal.

The MPSC rejected the argument put forth by the opponents of the proposal that the hearing conducted pursuant to Rule 333 denied them due process and an opportunity to be heard. It rejected, as well, allegations that its staff had not acted in representation of the public interest. The MPSC found that the proposal, as modified, was within the parameters established by the orders entered in Case No. U-8871, and that it was preferable to the status quo.

The MPSC rejected the AG's arguments that pertinent cross-examination was not allowed and that questions regarding the negotiations that preceded the settlement should have been allowed. It noted that the relevant inquiry was whether the settlement was in the public interest.

On April 6, 1993, CP filed an acceptance of the MPSC's March 31, 1993 order. CP chose option 2 for recovery of MCV capacity payments.

ABATE, the AG, and other parties filed petitions for rehearing of the March 31, 1993 order. In an order entered on May 26, 1993, the MPSC denied the motions for rehearing. It found option 2, as described in the March 31, 1993 order, lawful and reasonable. It declined to rescind or modify it, or to require facilities to run only in economic order. The MPSC found that economic dispatch, that is, use of the cheapest source of power, was not an inflexible principle and that other considerations might take precedence. The rate approved for recovery of MCV avoided costs was just and reasonable. The reduction to 3.62 cents/kWh

from 3.77 cents/kWh accounted for the operation of MCV under option 2.

The MPSC rejected ABATE's contention that option 2 was not supported by competent, material and substantial evidence on the whole record. It rejected the assertion that, because the option had not been offered by a party, participants had been denied the right to be heard. The MPSC concluded that it was not limited to accepting or rejecting positions advanced by parties.

ABATE'S APPEALS
THE JUSTNESS AND REASONABLENESS OF THE RATES

Initially, ABATE argues that the rates for electric service established in the MPSC's March 31, 1993 order are not just and reasonable, as required. *Detroit v Public Service Comm*, 308 Mich 706, 716; 14 NW2d 784 (1944). The order allows MCV to be uneconomically dispatched, that is, to be utilized when it is not the most economic source of power. ABATE alleges that the MPSC lacks the authority to order uneconomic dispatch, because it cannot make management decisions. *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 154-155; 428 NW2d 322 (1988).

To obtain the higher revenues available under option 2 of the March 31 order, CP must run MCV whenever capacity is available, even if other facilities could be operated more economically. This uneconomic dispatch, ABATE reasons, will result in unnecessary charges to ratepayers which are per se unjust and unreasonable. ABATE urges that the MPSC cannot be allowed to let CP run MCV out of economic order and incur unnecessary costs. It constitutes a breach of the MPSC's statutory duty to ensure that a utility

minimizes the cost of energy to the ratepayer. MCL 460.6j(6); MSA 22.13(6j)(6).

All rates, fares, charges, classifications and joint rates, regulations, practices and services prescribed by the MPSC are presumed, prima facie, to be lawful and reasonable. MCL 462.25; MSA 22.44; *Michigan Consolidated Gas Co v Public Service Comm,* 389 Mich 624; 209 NW2d 210 (1973). A party aggrieved by an order of the MPSC bears the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8).

The Michigan constitution provides that a final agency order must be authorized by law and be supported by competent, material and substantial evidence on the whole record. Const 1963, art 6, 28; *Attorney General v Public Service Comm,* 165 Mich App 230, 235; 418 NW2d 660 (1987). A reviewing court gives due deference to the MPSC's administrative expertise, and is not to substitute its judgment for that of the MPSC. *Yankoviak v Public Service Comm,* 349 Mich 641, 648; 85 NW2d 75 (1957); *Building Owners & Managers Ass'n of Metropolitan Detroit v Public Service Comm,* 131 Mich App 504, 517; 346 NW2d 581 (1984), aff'd 424 Mich 494; 383 NW2d 72 (1986).

ABATE has not demonstrated that the rates established in the MPSC's March 31, 1993 order are unjust, unlawful or unreasonable. The order allows CP to run MCV out of economic order; however, the record evidence showed that the increased cost of that activity would total $7.9 million. The savings that would result from reducing the capacity rate from 3.77 cents/kWh to 3.62 cents/kWh would total $10.7 mil-

lion. The result of CP choosing option 2 is a net savings to ratepayers.

ABATE's reliance on *Union Carbide, supra,* is misplaced. In that case the MPSC ordered CP to cease operating certain oil-fired generating units out of economic order, and prevented CP from passing on to ratepayers the additional fuel expenses incurred. Our Supreme Court held that the MPSC exceeded its authority in ordering CP to cease operating the facilities. The *Union Carbide* Court found that the decision to operate or not to operate a particular facility was a management decision. The MPSC's statutory authority to fix and regulate rates did not encompass the authority to make management decisions.

In the instant case, the MPSC did not order CP to operate MCV out of economic order. CP must operate MCV when it is available, regardless of the availability of other facilities, in order to recover capacity charges. However, its recovery is limited to 88.7 percent of the first 915 MW of energy taken from MCV. In addition, the capacity charge for that energy is discounted from 3.77 cents/kWh to 3.62 cents/kWh.

Under option 2, the occasional uneconomic dispatch of MCV will nevertheless result in a savings to ratepayers. The fact of the savings, which is documented by record evidence, demonstrates that the capacity charges allowed by the MPSC order are not per se unjust and unreasonable. Option 2 is fully consistent with the MPSC's statutory duty to disallow recovery of unreasonable and imprudent expenses. MCL 460.6j(6); MSA 22.13(6j)(6).

THE APPROPRIATENESS AND ADEQUACY
OF SUPPORT FOR OPTION 2

Next, ABATE points out that option 2 for recovery of capacity costs was revealed for the first time in the order of March 31, 1993, and relies on a twenty-three percent reserve margin. ABATE urges that it is not supported by competent, material and substantial evidence on the record. Const 1963, art 6, 28. CP was prepared to accept a "discounted" capacity rate of 3.62 cents/kWh without regard to uneconomic dispatching of MCV. This indicated that a lower rate would have been appropriate to offset the increased cost of uneconomic dispatching provided for in option 2.

However, continues ABATE, no evidence was presented on this matter, because option 2 was not proposed by any party. Parties sought to introduce evidence to demonstrate that the rates presented in the revised settlement proposal were beyond the range of current market rates. The MPSC declined to consider such evidence from parties that did not participate in Case No. U-8871.

ABATE asserts that, as option 2 was not part of the proposal and was presented in the final order, objectors were not given a reasonable opportunity to present evidence as required by Rule 333. In addition, the MPSC's retention of a twenty-three percent reserve margin is not supported by the evidence. In its March 31, 1993 order, states ABATE, the MPSC acknowledged that CP's agreement not to seek a reserve margin higher than twenty percent was a small concession; the company's own studies showed that needs could be met with a smaller reserve margin. ABATE con-

cludes that the MPSC's refusal to order a new reserve margin was contrary to the evidence.

We find that ABATE's assertion that option 2 and reliance on a twenty-three percent reserve margin are not supported by the evidence is without merit. The MPSC was entitled to use its regulatory power to fashion an appropriate remedy based on the gargantuan record compiled in the proceedings. Both proponents and opponents of the revised settlement proposal testified at the hearings. The MPSC modified the proposal by adopting changes proposed by various parties, including ABATE, causing capacity costs to be recovered on the basis of actual energy delivered.

The record generated by the hearings in Case No. U-8871 was incorporated by reference. The MPSC was obliged to consider voluminous evidence on all issues, even those upheld in *Consumers Power I*, *supra*. The capacity rate of 3.77 cents/kWh approved in Case No. U-8871 and found to be supported by the evidence in *Consumers Power I*, *supra*, was discounted to 3.62 cents/kWh in option 2.

The alleged appropriateness of a rate even lower than 3.62 cents/kWh arises from the claim that a gas-fired proxy should have been the basis for determining CP's avoided costs. The MPSC rejected this assertion in Case No. U-8871, and its decision was found in *Consumers Power I*, *supra*, to be supported by the evidence. The fashioning of a remedy, option 2, based on record evidence, the adoption of which had been found to be reasonable, could not be deemed an unfair surprise.

The twenty-three percent reserve margin was adopted in Case No. U-8871, and affirmed on appeal. Evidence showed that the CP's peak demand, on

which the reserve margin was based, had in fact surpassed the forecasted amount. While CP agreed not to seek a reserve margin higher than twenty percent, the MPSC's decision to retain the twenty-three percent margin was supported by the requisite evidence. ABATE presents no authority to support its apparent proposition that the MPSC was required to accept only modifications suggested by a party to the proceedings.

### THE DECISION TO STRIKE CERTAIN EVIDENCE ALLEGING DISCRIMINATORY RATES

Finally, ABATE argues that the MPSC improperly struck proffered testimony demonstrating that the rate structure in the revised settlement proposal was discriminatory. It asserts that the rates unreasonably allocated a disproportionate share of costs to high load factor customers, including ABATE's industrial members. The MPSC determined that the testimony was outside the scope of the proceedings. ABATE insists that the fact that high load factor customers purchase more kWh for a given level of capacity than do low load customers does not justify allocating to them a higher share of costs.

This issue is without merit. ABATE's argument attacks a rate structure established by the MPSC in an earlier case. When the issue was addressed in Case No. U-8871, the MPSC concluded that the record did not contain sufficient evidence to permit a restructuring of rates. Further consideration was deferred to power supply cost recovery cases. Case No. U-10127 was a continuation of Case No. U-8871. We find that the MPSC's decision to strike testimony in Case No. U-10127 was not arbitrary or capricious and did not deny due process to ABATE. The MPSC stated that the

issue could be revisited in a later rate case or con-
tested proceeding. CP has filed a rate case; thus, the
issue will be litigated. ABATE was not denied an
opportunity to be heard. Rule 333(5)(a).

THE ATTORNEY GENERAL'S APPEAL

THE ALLEGED FAILURE TO CONSIDER ALTERNATIVES

Initially, the AG argues that the MPSC unlawfully
failed to consider whether the revised settlement pro-
posal was fair, just, reasonable and in the public
interest in light of available alternatives. The AG
asserts that it failed to represent the public interest
through the actions of its staff, and reduced the
capacity rate without supporting evidence. According
to the AG, the MPSC should have inquired whether its
staff had adequately served the public interest when
participating in attempts to reach a settlement, and
precluded inquiry from other parties.

The AG contends that the staff viewed itself as an
agent of the MPSC Commissioners and did not act
independently. It ignored the requirement that orders
entered in Case No. U-8871 be adhered to as a tool to
gain real concessions. Moreover, continues the AG, no
evidence in the record from either Case No. U-8871 or
U-10127 supported the reduction in the capacity rate
from 3.77 cents/kWh to 3.62 cents/kWh. Record evi-
dence showed that CP had previously discounted non-
dispatchable contracts from non-affiliate QFs by ten
percent.

We find that the AG's arguments are without merit.
The criticism of the negotiation process that gave rise
to the revised settlement proposal contradicts the
record evidence. The chief negotiator for the staff tes-
tified that savings to and protection for the ratepayers

were the primary considerations during negotiations. He stated that the MPSC did not direct the negotiations.

This Court is charged with determining whether an order of the MPSC is lawful and reasonable. MCL 462.25; MSA 22.44. This standard of review and, particularly, that in Rule 333 require that the outcome of any negotiation process, not the chronology of the process itself, be in the public interest. The inquiry precluded by the MPSC related to the chronology of the negotiation process, not to the substance of the settlement. The MPSC utilized its administrative expertise to examine, modify, and approve the revised settlement proposal. As its findings regarding due process and the benefits of the proposal are supported by the requisite evidence, this Court will not substitute its judgment for that of the MPSC. *Yankoviak, supra.*

While the MPSC acknowledged that CP's agreement not to seek a reserve margin above twenty percent was a small concession, the proposal resulted in other, significant concessions from CP. It required CP to accept cost recovery in three power supply cost recovery cases at a rate significantly below the leveled capacity rate of 3.77 cents/kWh determined in Case No. U-8871. This provision resulted in a savings of approximately $235 million for ratepayers. CP relinquished a claim to seek this recovery in the future. CP agreed to dismiss appeals of MPSC orders in three cost recovery cases. CP agreed not to pursue $125 million in cost disallowances.

The AG's position favored using a gas-fired proxy to calculate CP's avoided costs. The contentions that alternatives went unconsidered and that the reduced

capacity rate lacked evidentiary support reflect that position. However, the issue was fully litigated in the hearings in Case No. U-8871 where the MPSC determined that a coal-fired proxy should be used. In *Consumers Power I*, *supra*, this Court found that the MPSC's decision was supported by record evidence. 189 Mich App at 181-184. The supporting evidence was incorporated into the record in Case No. U-10127. The MPSC considered changing the decision and concluded that the arguments presented by the AG's witness were not persuasive when compared to those of a witness for several independent cogenerators. The MPSC concluded that the evidence did not support a finding that the use of the coal-fired proxy should be abandoned.

The evidence in the record in Case No. U-8871, pointed to by this Court as supportive of the MPSC's decision, remains intact. In the hearings in Case No. U-10127, the MPSC was entitled to rely on the testimony of the witness for the independent cogenerators. It had a rational basis, notwithstanding that the AG's witness presented a contrary view. *Great Lakes Steel Division of Nat'l Steel Corp v Michigan Public Service Comm*, 130 Mich App 470, 481; 344 NW2d 321 (1983). The MPSC's decision to continue to use a coal-fired proxy was supported by the evidence.

We conclude that the record contained evidence supporting a reduction in the capacity rate from 3.77 cents/kWh to 3.62 cents/kWh. It showed that the reduction would result in a savings of approximately $10.7 million. The chief negotiator for the staff quantified the savings. No evidence supports the AG's assertion that the ten percent discount rate applied to non-

dispatchable contracts from non-affiliate QFs in other cases should have been applied in this case.

The revised settlement proposal allowed CP to charge ratepayers for up to 1,199 MW of capacity, an increase from the 1,160 MWs approved in Case No. U-8871. The AG contends that no evidence supported the avoided cost rates approved for this additional capacity.

This issue is without merit. Testimony from the witness for the independent cogenerators established that CP's current avoided costs were higher than the recovery provided for in the proposal. The testimony also established that the additional capacity approved in the proposal should be priced at the same rates. It supported the MPSC's findings. *Great Lakes Steel, supra.*

### MPSCy'S RESPONSIVENESS TO THE COURT'S REMAND ORDER

Finally, the AG argues that the MPSC failed to answer this Court's remand order in *Consumers Power I, supra,* in either the revised settlement proposal or the order of March 31, 1993. The AG contends that the MPSC failed to clarify whether it calculated CP's avoided capacity cost as of the date the obligation between CP and MCV was incurred. Also, it neglected to consider all factors in 18 CFR 292.304(e) when calculating avoided cost.

Regarding the first remand issue, the MPSC clarified that it calculated CP's avoided cost as of the time the obligation was incurred, i.e., at the time the energy was delivered. The date of calculation was 1988; the rate of calculation was escalated to 1990 dollars. This

method comports with 18 CFR 292.304(d)(2)(ii), and is entitled to deference.[4] *Yankoviak, supra.*

Regarding the second remand issue, the MPSC clarified that it considered the factors in 18 CFR 292.304(e).[5] This Court's remand order did not require

---

[4] 18 CFR 292.304(d) provides:

Each qualifying facility shall have the option either:

(1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided cost calculated at the time of delivery; or

(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

(i) The avoided cost calculated at the time of delivery; or

(ii) The avoided cost calculated at the time the obligation is incurred.

[5] 18 CFR 292.304(e) provides:

Factors affecting rates for purchases. In determining avoided costs, the following factors shall, to the extent practicable, be taken into account:

(1) The data provided pursuant to 292.302(b), (c), or (d), including State review of any such data;

(2) The availability of capacity or energy from a qualifying facility during the system daily and seasonal peak periods, including:

(i) The ability of the utility to dispatch the qualifying facility;

(ii) The expected or demonstrated reliability of the qualifying facility;

(iii) The terms of any contract or other legally enforceable obligation, including the duration of the obligation, termination notice requirement and sanctions for non-compliance;

(iv) The extent to which scheduled outages of the qualifying facility can be usefully coordinated with scheduled outages of the utility's facilities;

(v) The usefulness of energy and capacity supplied from a qualifying facility during system emergencies, including its ability to separate its load from its generation;

(vi) The individual and aggregate value of energy and capacity from qualifying facilities on the electric utility's system; and

either a new analysis of each factor or a quantification of the effect of each factor on the rate approved. The analysis supplied by CP and adopted by the MPSC contained the MPSC's own statements regarding the various factors. It did not breach its duty to provide its own analysis of the factors.

We deem the other issues not briefed by the AG abandoned on appeal. *ABATE v Public Service Comm*, 173 Mich App 647, 673; 434 NW2d 648 (1988).

Affirmed.

---

(vii) The smaller capacity increments and the shorter lead times available with additions of capacity from qualifying facilities; and

(3) The relationship of the availability of energy or capacity from the qualifying facility as derived in paragraph (e)(2) of this section, to the ability of the electric utility to avoid costs, including the deferral of capacity additions and the reduction of fossil fuel use; and

(4) The costs or savings resulting from variations in line losses from those that would have existed in the absence of purchases from a qualifying facility, if the purchasing electric utility generated an equivalent amount of energy itself or purchased an equivalent amount of electric energy or capacity.